85 F.3d 481
 64 USLW 2791, 110 Ed. Law Rep. 38
 Lorraine VILLANUEVA, on behalf of herself and her minor
children, Delores Villanueva, Kayla Villanueva, and Esteban
Villanueva; Jennie M. Vasco and Claude L. Vasco, on their
own behalf and on behalf of their minor child, Marie
Vasco; Bernadette Villalon, on behalf of herself and her
minor children, Jason Villalon and Ian Villalon; and
collectively on behalf of all others similarly situated,
Plaintiffs/Counter-Defendants-Appellants/Cross-Appellees,
v.
Warren D. CARERE, President and Member, Board of Education
for Pueblo School District No. 60, Dennis Flores, Mary Lou
Jackson, Abel J. Tapia, Judy Weaver, Members, Board of
Education for Pueblo School District No. 60; Board of
Education for Pueblo School District No. 60,
Defendants-Appellees/Cross-Appellants,
and
The State of Colorado ex rel. Gale A. Norton and the
Colorado State Board of Education,
Defendants-Intervenors-Counter
Claimants-Appellees.
Colorado League of Charter Schools, Amicus Curiae.
 Nos. 94-1454, 94-1479.
 United States Court of Appeals,
Tenth Circuit.
 June 4, 1996.
 
 Margaret L. Herdeck, Pueblo, Colorado (J.E. Losavio, Jr. and Peter S. Blood, Pueblo, Colorado, and William S. Barber of Pueblo County Legal Services, Inc., Pueblo, Colorado, with her on the briefs), for Plaintiffs-Counter Defendants-Appellants/Cross-Appellees.
 Franklin A. Nachman (Martin Semple with him on the brief), of Semple & Jackson, P.C., Denver, Colorado, for Defendants-Appellees/Cross-Appellants Warren Carere, et al.
 William E. Thro, Assistant Attorney General, Denver, Colorado (Gale A. Norton, Attorney General of Colorado, with him on the brief), for Defendants-Intervenors-Counter Claimants/Appellees the State of Colorado ex rel. Gale A. Norton and the Colorado State Board of Education.
 James W. Griffin, Lakewood, Colorado, on the brief for Amicus Curiae the Colorado League of Charter Schools.
 Before PORFILIO, HENRY, and BRISCOE, Circuit Judges.
 HENRY, Circuit Judge.
 
 
 1
 Plaintiffs-appellants, a class of Hispanic parents and their children (the Parents), brought this action to enjoin the closing of two Pueblo, Colorado public schools and the opening of a charter school pursuant to the Colorado Charter Schools Act, Colo.Rev.Stat. §§ 22-30.5-101 to -114 (the Act). The Parents alleged that the decisions of defendant-appellee the Board of Education for Pueblo School District No. 60 (the Board) to close the schools at which their children were enrolled and, three months before, to approve the opening of a charter school had deprived them of their Fourteenth Amendment right to equal protection of the laws and of those rights guaranteed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4a. In addition to raising various other claims, which they have not pursued on appeal, the Parents also challenged the constitutionality of the Charter Schools Act under the Equal Protection Clause. The State of Colorado and the Colorado State Board of Education intervened to defend the Act.
 
 
 2
 Following a five-day hearing, the district court denied the Parents' motion for a permanent injunction, finding that they had failed to demonstrate: (1) that the Board had intentionally discriminated against them; (2) that the Parents would suffer a discriminatory impact as a result of the Board's actions; or (3) that the Charter Schools Act violated the Constitution. We affirm.
 
 
 3
 The issues for review are (1) whether the Parents met their burden of proving either discriminatory intent, as required for a violation of the Equal Protection Clause, or discriminatory impact, as required for a claim under the implementing regulations of Title VI, with respect to either the school closings or the Board's approval and operation of a new charter school under the Charter Schools Act, and (2) whether the Act is on its face discriminatory in violation of the Equal Protection Clause.
 
 I. BACKGROUND
 
 4
 Pueblo School District 60 (the District), comprised of some thirty-three elementary, middle, and high schools, an alternative school, and a day care facility, enrolls approximately 18,000 students of whom almost exactly 50% are Hispanic and about 64% are minorities. In recent years, the District has experimented with innovative approaches to education, forging an educational and administrative alliance with the University of Southern Colorado to improve educational quality and allocate resources more efficiently. As required by Colorado law, District 60 operates under a "schools of choice" system, in which parents may send their children to any school in the District, see Colo.Rev.Stat. §§ 22-36-101 to -106, although free transportation generally is not provided to those who choose to attend schools outside their neighborhood.
 
 
 5
 The Colorado Charter Schools Act authorizes local school boards to contract with interested parties to establish charter schools--public schools that are managed by their sponsors and financed primarily with the local school district's funds. See Colo.Rev.Stat. §§ 22-30.5-101 to -112. In late 1993, the University of Southern Colorado submitted to the Board an application to establish in District 60 a charter school known as Pueblo School for Arts and Sciences (PSAS), which proposed to use nontraditional pedagogic methods to address especially the needs of "at-risk" and minority students.[1] See Aplts' App. at 45. The proposal asserted the sponsors' commitment to admit a student body reflecting the make-up of "the educational community of Pueblo in terms of gender, ethnicity, and economic status," to use "targeted recruitment" "only to maintain a balanced and diverse student body," and to admit students on a first-come, first-served basis, without regard to test scores. Id. at 46. The sponsors emphasized the importance of a strong "community/school partnership," id. at 44, by requiring parents annually to perform eighteen hours of service to the school, id. at 48. In December 1993, the Board voted pursuant to its authority under the Act to approve the application of PSAS.
 
 
 6
 The administrators of PSAS sought to ensure geographic and ethnic diversity by dividing District 60 into eight regions for purposes of soliciting enrollment applications; students were admitted on a first-come, first-served basis within each region. Application forms notified parents of the community service requirement, a mandatory pre-admission parental interview, and the requirement that parents provide transportation for their children, and informed parents that admission was to be based upon commitment to the school and not upon previous student performance. The forms also requested information about parents' place of employment. See id. at 78-79.
 
 
 7
 In practice, no parental interviews were held until after admission. Community groups publicized the charter school among the Hispanic community in Pueblo. In its first year, 1994-95, the projected enrollment at PSAS included 52% Hispanic students and 62% minority students. Aplees' App. at 78.
 
 
 8
 In February 1994, three months after the vote to approve PSAS, the Board voted to close Hyde Park Elementary School and Spann Elementary School. Approximately 75% of students in each school were Hispanic. The issue of school closures had been before the Board for three years.
 
 
 9
 Both schools hosted programs for "at-risk" students, including federally funded breakfast and lunch programs and school-wide Chapter I programs[2] that contributed to maintaining pupil-teacher ratios below the District average. In addition, Hyde Park was one of eighteen schools chosen nationwide to host a Parent Resource and Involvement Strength Education (P.R.A.I.S.E.) program, which successfully encouraged broad parental involvement at the school.
 
 
 10
 In deciding which schools to close, the Board considered primarily four factors: (1) the present and projected enrollment at the schools to be closed and (2) at nearby schools; (3) the percentage of space utilized; and (4) the total cost per student. The Board did not directly consider the impact of school closures on the surrounding communities or the quality of educational programs at the schools chosen for closure.
 
 
 11
 Of the students formerly attending Hyde Park and Spann, most were to be transferred to other schools consisting predominantly (over 70%) of minority students. In turn, to make room for the incoming students, one of the "receiving schools" was to transfer about forty-four students to another predominantly minority school. While many of the former Hyde Park and Spann students were to be bussed, some would be able to walk to school; some of the latter would now, unlike in the past, have to cross busy intersections. In deciding where to transfer these students, the District considered factors including the proximity and capacity of receiving schools and the desire to have former Hyde Park and Spann teachers follow the students. The District planned to transfer the P.R.A.I.S.E. program to one of these receiving schools and also to have Chapter I funding follow qualifying Hyde Park and Spann students to the receiving schools.
 
 II. DISCUSSION
 
 12
 Following a five-day hearing, at which thirty witnesses testified and over 200 exhibits were offered, the district court issued a twenty-page Memorandum Opinion and Order concluding that the Board did not intentionally discriminate against Hispanics, either in the decision to close Hyde Park and Spann or in its approval and oversight of PSAS, and that the Parents failed to establish that the school closures would have a discriminatory impact on Hispanic students. See Aplts' App. at 261-62. The court also upheld the constitutionality of the Charter Schools Act against the Parents' Equal Protection and Due Process attacks. See id. at 280, 285.
 
 A. Discriminatory Intent
 
 13
 Proof of racially discriminatory intent or purpose is required to demonstrate a race-based violation of the Equal Protection Clause. Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The discriminatory purpose need not be the only purpose, but it must be "a motivating factor in the decision." Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).
 
 
 14
 As the parties properly acknowledge, we may reverse the trial court's finding of no discriminatory intent only if it is clearly erroneous. See, e.g., Dowell v. Board of Educ. of Okla. City Pub. Schs., 8 F.3d 1501, 1518 (10th Cir.1993) (applying clearly erroneous standard to a finding of no discriminatory intent by a school board). Not only is this standard of review well-established, but its rationale is exemplified by a case such as this one. The district court heard extensive testimony before making its factual determinations, which included findings that the defendant Board members did not intend to discriminate against Hispanic students, Aplts' App. at 261, and that they were sincere in their stated purpose of striving to improve the quality of education in the District, id. at 263. Findings such as these, based on the trial court's determination of the credibility of witnesses, demand of the appellate court a heightened degree of deference. See Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 15
 Although the Parents presented no direct evidence of discriminatory intent, the district court's inquiry could not stop there. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266, 97 S.Ct. at 564. The Parents' claim that discriminatory intent was a motivating factor in the school closings decision rests principally on four allegations: that the closures resulted in overcrowded classrooms in the selected receiving schools; that the Board failed to consider the high quality of the educational programs offered at Hyde Park and Spann or the impact of school closings on the affected communities; that the Board did not make adequate arrangements to ensure that the P.R.A.I.S.E. program and high levels of parental involvement would be maintained after the closures; and that the Board improperly took into consideration the ethnic mix of the closed and receiving schools. See Aplts' Br. at 30.
 
 
 16
 However, the evidence concerning these allegations, when viewed in concert with "the totality of the relevant facts," see Davis, 426 U.S. at 242, 96 S.Ct. at 2048, is insufficient to lead us to conclude that the district court's finding of a lack of discriminatory intent was clearly erroneous. Indeed, several of the Board members and the Superintendent are themselves Hispanic, see Tr. at 102, 459, and have notable records of commitment to the Hispanic and minority communities of Pueblo, id. at 113-14, 305-06, including long years of service to the plurality-Hispanic District 60, id. at 187-188, 459. The Parents' separate claim of discriminatory intent in the implementation of admissions procedures for PSAS similarly rests on circumstantial evidence which, in the face of the clear purpose of the charter school and its admissions procedure--to serve at-risk students and to admit a broad cross-section of the community--is inadequate to lead us to a different conclusion than that of the district court.
 
 
 17
 Because the district court correctly found that the Board did not intentionally discriminate against Hispanic parents, we hold that it properly found for the appellees with respect to the Parents' equal protection claims.
 
 B. Discriminatory Impact
 
 18
 The Parents also argue that the school closures and the implementation of the PSAS admissions procedure violated their right under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4a, to be free from discrimination "under any program or activity receiving Federal financial assistance," id. § 2000d. Although Title VI itself proscribes only intentional discrimination, certain regulations promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent. Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 584 n. 2, 103 S.Ct. 3221, 3223 n. 2, 77 L.Ed.2d 866 (1983).
 
 
 19
 The district court found that the Parents had failed to demonstrate that the school closures would have a discriminatory impact on Hispanic students. The proper standard of review of such a determination concerning disparate impact depends upon the basis of the alleged error. When the district court allegedly has used the wrong groups as the basis of a statistical comparison, we have employed plenary review. See Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1244 n. 29 (10th Cir.1991). By contrast, when the dispute involves "[u]nderlying factual findings" the disparate impact determination of the district court is undisturbed unless clearly erroneous. See id. Here the Parents do not allege any error in the district court's method of analysis. In fact, they did not assert a traditional disparate impact claim, which would have involved a comparison of the statistical impact of the Board's decisions on the class allegedly harmed, i.e. Hispanics, relative to a relevant comparison group. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 992, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988) (plurality opinion) (citing "the inevitable focus on statistics in disparate impact cases"); Ortega, 943 F.2d at 1242 (explaining that a prima facie disparate impact discrimination case requires a showing that the challenged policy caused "a significant disparate impact on a protected group"). In rejecting the Parents' broadly pleaded disparate impact claim, the district court made factual findings supporting its conclusion that there had been no demonstrated adverse impact on Hyde Park and Spann students as a group, regardless of ethnicity. Because it is these findings which the Parents challenge on appeal, our review is for clear error. See Ortega, 943 F.2d at 1244 n. 29.
 
 
 20
 Upon a careful examination of the record, we cannot say that the district court's findings were clearly erroneous. The schools to which the student appellants were transferred had facilities comparable to those of the closed schools and, although the testimony indicates some confusion about this, we conclude that the court did not err in determining that the receiving schools would not be over-crowded. See Aplts' App. at 279; Tr. at 409, 443-49. Moreover, Chapter I funding and the P.R.A.I.S.E. program were to follow qualified students to the receiving schools. Significantly, that the transfers resulted in high percentages of at-risk and minority students at receiving schools has little relevance to the issue of disparate impact because Hyde Park and Spann, the very schools that the appellants have fought to resurrect, themselves enrolled high percentages of such students.
 
 
 21
 We briefly respond to the Parents' argument, not directly addressed in the district court's order, that Hispanic students were disparately impacted by the opening of PSAS. Clearly this cannot be the case, as the uncontroverted evidence shows that the 1994-95 projected enrollment at PSAS was about 50% Hispanic, compared with approximately the same proportion of Hispanic students in the district-wide population.
 
 
 22
 Because the district court's findings that neither the school closings nor the opening of PSAS resulted in a negative disparate impact on the Hispanic population is not clearly erroneous, we hold that the court correctly found for the appellees with respect to the Parents' Title VI claims.
 
 C. The Colorado Charter Schools Act
 
 23
 We conduct plenary review of the district court's determination that the Parents have failed to establish that the Charter Schools Act passed by the Colorado legislature violates the Equal Protection Clause of the Fourteenth Amendment. See Patton v. TIC United Corp., 77 F.3d 1235, 1245 (10th Cir.1996). We begin our review with the venerable presumption that the acts of a state legislature are constitutional. See Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745-46, 60 L.Ed.2d 269 (1979) (employing the presumption of validity against a challenge under the Equal Protection Clause). Moreover, courts pay particular deference to the states in decisions involving "the most persistent and difficult questions of educational policy" because our "lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). "The very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect." Id. (quoting Jefferson v. Hackney, 406 U.S. 535, 546-47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972)).
 
 
 24
 Such deference is abandoned, though, when a legislative act either disadvantages a "suspect class" or impinges upon the exercise of a "fundamental right." See Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982). The Parents challenge the provision of the Act that reserves thirteen charters for "applications which are designed to increase the educational opportunities of at-risk pupils," Colo.Rev.Stat. § 22-30.5-109(2)(a), because they allege that it creates a suspect classification. The Act defines "at-risk pupils" as those "who, because of physical, emotional, socioeconomic, or cultural factors, [are] less likely to succeed in a conventional educational environment." Id. § 22-30.5-103(1)(a). The Parents argue that the word "cultural" in this definition "is a code-word for ethnic minority," and that the Act therefore separates and classifies students according to race and ethnicity. See Aplts' Br. at 31-33. Such criteria are traditionally suspect and would thus trigger strict scrutiny, which is almost always fatal to a classification. See Fullilove v. Klutznick, 448 U.S. 448, 519, 100 S.Ct. 2758, 2795-96, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring).
 
 
 25
 We share the Parents' concern with the practice of drawing classifications based on "culture," which might in some circumstances be used as a proxy for ethnicity, race, national origin or some other suspect classification. However, we believe that, reading the Act in its entirety, it simply does not create any classification of students, and therefore it cannot create a suspect classification. The Act expressly requires of charter schools that "[e]nrollment must be open to any child who resides within the school district" and that "[e]nrollment decisions shall be made in a nondiscriminatory manner." Colo.Rev.Stat. § 22-30.5-104(3). Moreover, under the Colorado Public Schools of Choice Act, id. §§ 22-36-101 to -106, enrollment in any public school generally is open to any child in Colorado, id. § 22-36-101. Hence, charter schools designed to increase the educational opportunities of at-risk pupils must admit on an equal basis applicants who are not so classified, and, conversely, at-risk students are not required to attend such schools but may attend any public school they and their parents choose. Therefore, even though we might agree in other contexts that treating students differently on the basis of "culture" could trigger strict scrutiny, the carefully crafted provisions of the Act mandating open enrollment and expressly proscribing discrimination convince us that no suspect classification has been created.[3] Because the Act creates no suspect classification, and because no fundamental right is alleged to be affected, the correct standard is whether the challenged state action rationally furthers a legitimate state purpose. McGinnis v. Royster, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059-60, 35 L.Ed.2d 282 (1973).
 
 
 26
 One of the stated purposes of the Act is to allow communities to "create new, innovative, and more flexible ways of educating all children within the public school system." Colo.Rev.Stat. § 22-30.5-102(3). Colorado has a legitimate interest in encouraging innovation in education. See Rodriguez, 411 U.S. at 50, 93 S.Ct. at 1305 ("No area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education."). We hold that the Charter Schools Act is rationally related to that interest.
 
 III. CONCLUSION
 
 27
 We cannot fail to observe the acrimony in this long-standing community battle. Perhaps it comes from the fact that although education is not a "fundamental right" in the United States, good parents nonetheless have fundamental aspirations about the education of their children. Hence it is not surprising that these convictions should produce conflicts that run equally deep. Yet all disagreements cannot be resolved by the federal courts, especially when they relate to local educational policies upon which both warring factions hold deep and sincere beliefs. This question is political, not legal.
 
 
 28
 Though we do not endorse the district court's lengthy recommendations, we trust that the parties will carefully examine them for whatever relevance and use they may have to this dispute. Our review is carefully limited by the standards we have employed. Though we may hope that both parties will consider the other's sincerity and good intentions, and that they will adjust policies and protest accordingly, we have neither the capacity nor the power to act on that hope.
 
 
 29
 For the foregoing reasons, we AFFIRM the district court's denial of the Parents' motion for a permanent injunction and the district court's order that each party shall bear its own costs.
 
 
 
 [1]
 The Act defines an "at-risk pupil" as "a pupil who, because of physical, emotional, socioeconomic, or cultural factors, is less likely to succeed in a conventional educational environment." Colo.Rev.Stat. § 22-30.5-103(1)(a)
 
 
 [2]
 Chapter I refers to a federal program, 20 U.S.C. §§ 2701-2976, providing funds to state and local educational agencies "to improve the educational opportunities of educationally deprived children" through provision of "supplemental education programs, schoolwide programs, and the increased involvement of parents in their children's education," id. § 2701(b)
 
 
 [3]
 We note the district court's concern with the "modified first come/first served," Aplts' App. at 283, admissions procedure that was implemented at PSAS, which seems to favor children of parents with the resources and the acumen to apply early. See id. at 283-85. Though we do not believe this rises to an actionable level, we also note that the federal Charter Schools Act requires schools receiving funds under the Act to admit students on the basis of a lottery, see 20 U.S.C. § 8066(1)(H), indicating that Congress apparently shared the district court's concern