CHARLIE F., by his parents and next friends NEIL and Bonnie F., Plaintiff–Appellant,

v.

BOARD OF EDUCATION OF SKOKIE SCHOOL DISTRICT 68, et al., Defendants–Appellees.

No. 96–1538.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Oct. 24, 1996.

Derrick M. Ford, Laura J. Miller, Jason Yurasek, Law Student (argued), Northwestern University Legal Clinic, Chicago, IL, for Plaintiff–Appellant.

Lisa A. Rapacz, Ugne T. Adams, Fay Hartog (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Before CUMMINGS, EASTERBROOK, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

When Charlie F. was in fourth grade, his teacher invited her pupils to vent their feelings about certain topics. One favorite topic was Charlie, whose disabilities (including attention deficit disorder and panic attacks) drew attention. According to the complaint, whose allegations we must accept, the teacher repeatedly invited her pupils to express their complaints about Charlie—and they all too willingly obliged, leading to humiliation, fistfights, mistrust, loss of confidence and self-esteem, and disruption of Charlie's educational progress. The teacher instructed her pupils to tell no one about these sessions, but Charlie's parents eventually found out and moved him to a different school. Youths from his former class still taunt and ridicule Charlie when they meet, in part because of the license they think the fourth grade teacher provided for such behavior.

Charlie has an "individual educational plan" under the auspices of the Individuals

with Disabilities Education Act, 20 U.S.C. §§ 1400–1491o (IDEA). His parents are satisfied with his current placement but disgusted with what happened in fourth grade. They filed this suit on Charlie's behalf seeking damages from the teacher, the school's principal (who knew about the gripe sessions), the school district's superintendent, and the school district itself. The suit contends that the Constitution of the United States (through 42 U.S.C. § 1983), the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the state law of torts all provide damages for misconceived educational strategies that injure disabled pupils. Instead of responding on the merits, however, the defendants asked the court to postpone adjudication until Charlie exhausts administrative remedies under the IDEA, a statute that he had not invoked in the first place. This unusual response depends on an unusual provision in the IDEA, which reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(f). Thus any pupil who wants "relief that is available under" the IDEA must use the IDEA's administrative system, even if he invokes a different statute. Charlie replied that he wants money damages, which the IDEA does not supply.

■ The district court dismissed the federal claims for lack of subject-matter jurisdiction. (State-law claims went too, once the federal claims disappeared, for the parties are all citizens of Illinois.) The court did not say that the IDEA permits an award of money. Instead, the judge observed, the IDEA covers "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E). This led the judge to believe that the IDEA occupies the field, an untenable conclusion. Section 1415(f) provides that the IDEA does not limit relief available under other laws. Moreover, failure to exhaust administrative remedies does not deprive a court of jurisdiction; lack of exhaustion usually is waivable, as lack of jurisdiction is not. See *Air Courier Conference v. Postal Workers Union*, 498 U.S. 517, 522–23 & n. 3, 111 S.Ct. 913, 916–17 & n. 3, 112 L.Ed.2d 1125 (1991); *Weinberger v. Salfi*, 422 U.S. 749, 766–67, 95 S.Ct. 2457, 2467–68, 45 L.Ed.2d 522 (1975); cf. *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987).

■ We must address the question the district court did not reach: whether Charlie is "seeking relief that is available under" the IDEA. See *Honig v. Doe*, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988). Charlie says that he wants compensatory money damages, which the IDEA does not authorize. It does not contain an explicit limit, but the structure of the statute—with its elaborate provision for educational services and payments to those who deliver them—is inconsistent with monetary awards to children and parents. So we held for the IDEA's predecessor, the Education for All Handicapped Children Act. *Anderson v. Thompson*, 658 F.2d 1205 (7th Cir.1981). The two statutes do not differ in any way material to this question, and we conclude that damages are not "relief that is available under" the IDEA. Accord, *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir.1995). This is the norm for social-welfare programs that specify benefits in kind at public expense, whether medical care or housing or, under the IDEA, education.

■ Charlie asks us to stop here: he wants compensatory money damages, the IDEA does not provide this form of relief, and that is that. Things are not so clear, however. The statute speaks of available relief, and what relief is "available" does not necessarily depend on what the aggrieved party wants. Certainly not in litigation. "Except as to a party against whom a judgment is entered by default, every final judg-

ment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed.R.Civ.P. 54(c). The nature of the claim and the governing law determine the relief no matter what the plaintiff demands. If this principle is equally applicable for purposes of § 1415(f), then the theory behind the grievance may activate the IDEA's process, even if the plaintiff wants a form of relief that the IDEA does not supply. Several district courts have used this principle to hold that the pleadings in court do not end the analysis under § 1415(f), and we think these decisions right. See *Hoekstra v. Independent School District No. 283*, 916 F.Supp. 941 (D.Minn.1996); *Doe v. Alfred*, 906 F.Supp. 1092 (S.D.W.Va.1995); *Waterman v. Marquette–Alger Intermediate School District*, 739 F.Supp. 361 (W.D.Mich. 1990).

Suppose a school fails to provide a reader for a blind pupil, who as a result falls behind. The IDEA provides relief: the school can assign a reader to the pupil for the future and can provide tutors and other special instruction until the pupil catches up. If disgruntled parents spurn this solution and demand compensation, the response should be that they cannot ignore remedies available under the IDEA and insist on those of their own devising; under the IDEA, educational professionals are supposed to have at least the first crack at formulating a plan to overcome the consequences of educational shortfalls. That the educational problem has consequences outside school (for example, the child's self-esteem and ability to get along with his peers might suffer when he lags behind in class) can't be enough to avoid the statutory system. So too if parents demand either educational services that local school districts need not provide (for example, full-time attendants in private schools, *K.R. v. Anderson Community School Corp.*, 81 F.3d 673 (7th Cir.1996)), or monetary compensation in lieu of the unavailable services. By making an unreasonable or unattainable demand parents cannot opt out of the IDEA.

■ Consider this from another angle. Why do Charlie's parents want money? Presumably at least in part to pay for services (such as counseling) that will assist his recovery of self-esteem and promote his progress in school. Damages could be measured by the cost of these services. Yet the school district may be able (indeed, may be obliged) to provide these services in kind under the IDEA. If it turns out that the school is *not* obliged to provide such services, that may be because Charlie's parents have exaggerated what happened in fourth grade, the consequences of those events, or both. In other words, the educational professionals and hearing officers who evaluate claims under the IDEA may conclude (a) that adequate remedial services can be provided, or (b) that Charlie does not today require services. The first outcome would show that relief is available under the IDEA; the second would provide information relevant to Charlie's claims under statutes other than the IDEA. In either event, pursuit of the administrative process would be justified. Charlie would not get the kind of relief the complaint demands, but this is not what § 1415(f) says. We read "relief available" to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.

■ Well, then, does the IDEA require the school district to afford services for someone in Charlie's position? The district says yes, and Charlie no—the opposite of the usual positions in litigation under the IDEA. For if the answer is yes, the school district may be put to considerable expense, even if it would have prevailed under § 1983 and the Rehabilitation Act. If the answer is no, then Charlie is putting all his eggs in one basket, and it looks to us like an incommodious basket. As it happens, we think the school district right. The IDEA requires a school district to provide not only education but also "related services", a term defined to include

transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be

for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17). Charlie's parents believe that his current educational program is apt, which they think means that any psychological services would not be "required to assist [Charlie] to benefit from special education". Yet the complaint they filed on his behalf deals with acts that have both an educational source and an adverse educational consequence; the complaint contends that his education has suffered as a result of the events in fourth grade; if he is doing fine in school today, then it is hard to see what this case is about. It would be odd to award damages because of deeds with so little educational effect that no ongoing steps to overcome them are warranted—and again we are unwilling to allow parents to opt out of the IDEA by proclaiming that it does not offer them anything they value, when the school district professes willingness to take corrective steps (if the facts justify them, a vital qualifier).

Charlie's parents also observe that medical services are provided for "diagnostic and evaluation purposes only", but psychological services are listed separately from medical services, and they are often essential if a plan is to have any realistic chance of facilitating education. The regulations implementing the statute provide that "psychological services" include "psychological counseling for children and parents." 34 C.F.R. § 300.16(b)(8)(v). See also 34 C.F.R. § 300.306(b).

Perhaps Charlie's adverse reaction to the events of fourth grade cannot be overcome by services available under the IDEA and the regulations, so that in the end money is the only balm. But parents cannot know that without asking, any more than we can. Both the genesis and the manifestations of the problem are educational; the IDEA offers comprehensive educational solutions; we conclude, therefore, that at least in principle relief is available under the IDEA.

Because the district court had subject-matter jurisdiction, its judgment is vacated. The case is remanded with instructions to dismiss for failure to use the IDEA's administrative remedies.