Brenda **CUDJOE**; Adam "Scottie" Carrington, a minor, by and through his next friend, Brenda Cudjoe, Plaintiff–Appellant,

v.

**INDEPENDENT SCHOOL DISTRICT NO. 12 a/k/a Edmond Public Schools and Ysleta Hansen, individually and in her official capacity as a teacher for ISD No. 12, Defendants–Appellees.**

No. 01–6008.

United States Court of Appeals, Tenth Circuit.

July 23, 2002.

---

Sheryl Gray Rasmus of The Rasmus Firm, Austin, TX, for Plaintiff–Appellant.

Frederick J. Hegenbart (Jerry A. Richardson with him on the brief), Rosenstein, Fist & Ringold, Tulsa, OK, for Defendant–Appellee Independent School District No. 12.

Maurice G. Woods, II (Michael McAtee with him on the brief), McAtee & Woods, P.C., Oklahoma City, OK, for Defendant–Appellee Ysleta Hansen.

Before EBEL and PORFILIO, Circuit Judges and SHADUR,* District Court Judge.

EBEL, Circuit Judge.

Plaintiff–Appellant, Brenda Cudjoe, individually and as next friend of Adam "Scottie" Carrington, brought suit against the Edmond Public School District and Ysleta Hansen (collectively "Appellees") for alleged violations of federal privacy and non-discrimination laws and the United States Constitution. Specifically, Appellant brought an action against the District and Hansen pursuant to 20 U.S.C. § 1232g, (the Family Educational Rights and Privacy Act, hereinafter referred to as "FERPA") and 42 U.S.C. § 1983. Appellant also claimed that Hansen and the District violated Scottie's right to privacy incorporated into the Due Process Clause of the Fourteenth Amendment. Appellant alleged that the District discriminated against Scottie on the basis of his disability in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. Finally, Appellant brought suit against the District for discrimination against Scottie on account of his race,[1] in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d.[2]

The district court granted summary judgment to the District and Hansen on all claims. Appellant appeals that judgment with respect to all claims except for the District's alleged violation of the ADA. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's grant of summary judgment in favor of Appellees.

## I. Background

Scottie began kindergarten in the District in the fall of 1989. At the conclusion of that school year, he was evaluated by his teacher and the school counselor, and they recommended that he be placed in developmental first grade the following year. These evaluations and recommenda-

---

* The Honorable Milton I. Shadur, Senior District Court Judge, Northern District of Illinois, sitting by designation.

1. Scottie is African–American.

2. Appellant also originally brought a state law tort claim of defamation against Hansen, over which the district court declined to exercise jurisdiction because it granted summary judgment to the District and Hansen on Appellant's federal claims. Appellant does not pursue her state law claim on appeal.

tions were recorded in a "Placement Form" dated April 11, 1990. Developmental first grade is not a special education placement. Appellant agreed with this recommendation. Scottie began the following year in Hansen's developmental first grade class. After three weeks in the class, Appellant removed Scottie from the class and the District.[3]

After Scottie's removal, the next time Appellant saw Hansen was eight and a half years later when Hansen purchased the condominium above Appellant. Hansen leased this condominium to Kathy Garrison. Over the next few months, Appellant and Garrison became involved in unfriendly encounters, which included each side calling the police on the other, and allegations of threats and racial epithets. Appellant also learned that someone had been making comments around the condominium property about herself and Scottie. She hired a private investigator, Christie Spencer, to discover the substance of the comments and their source.

Spencer arranged a meeting on March 22, 1999, in the condominium owned by Hansen. The meeting was tape recorded and attended by Hansen, Garrison, and Spencer. Hansen viewed the meeting as a "neighborly kind of dispute," not a school matter. Hansen's comments at that meeting about Scottie's social skills, behavior, and academic progress constitute the basis of Appellant's Fourteenth Amendment privacy claim.[4]

Scottie returned to the District for third grade and has been enrolled ever since. In the 1994–95 school year, his fifth-grade year, Scottie became ill, underwent sur-

gery, and was placed on "homebound" status. Scottie was diagnosed with Epstein–Barr virus, which fatigues him to the point where he cannot attend classes. As such, he has remained on homebound status ever since his fifth-grade year. An individual accommodation plan ("IAP") was developed for him pursuant to Section 504 to deliver homebound services,[5] and these IAP's have been revised annually. Appellant has participated in these meetings and her requests for educational services for Scottie have been complied with by the District, but at times, the District was late in providing some teaching materials to Scottie's homebound teacher. In the last two or three years, the associate superintendent, counselors not assigned to Scottie, psychologists, and a psychomotrist have attended these IAP meetings.

Appellant was allowed to request teachers from outside the District to teach Scottie for his seventh through tenth-grade years. Her recommendation to teach Scottie during his tenth-grade year, Carmen Heath, did not complete the District's employment forms until the spring semester of that year, because she was hired through the unconventional process of Appellant's selection. Upon receipt of these forms and completion of a background check, the District discovered that Heath had a prior felony conviction. The District allowed her to finish the remaining school year but did not continue her employment the next year.

Appellant was unhappy with this decision by the District because Scottie and Heath had a good relationship and she was pleased with Heath's performance. The

---

**3.** Neither party indicates the reason for this withdrawal.

**4.** Hansen's comments will be discussed in greater detail in our discussion of Appellant's privacy claim.

**5.** Scottie's homebound services consist of a teacher coming to his house to teach him the normal curriculum for his grade level, with the exception of his being excused from physical education.

District once again permitted Appellant to request a teacher for Scottie's eleventh-grade year. She selected an African-American male with twenty-three years of teaching experience and a master's degree. This candidate was interviewed by the District but was not hired. Instead, the District assigned Andrea Luster, who previously had taught Scottie in his fifth and sixth-grade years, to serve as his teacher for his junior year. Upon being notified that Luster would replace Heath, Appellant informed the District that she disapproved of this decision because Luster had had difficulty teaching Scottie sixth-grade math. Appellant had not expressed her dissatisfaction with Luster before this time, however. Because Appellant refused to let Luster teach Scottie, he was without a teacher for his eleventh-grade year.

The District's tardy provision of teaching materials, selection of Scottie's teachers, and attendance of additional personnel members at Scottie's IAP meetings provide the primary basis for Appellant's Section 504 disability discrimination and Title VI racial discrimination claims.

## II. Standard of Review

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1313 (10th Cir. 1999). Summary judgment is appropriate if the pleadings, affidavits, and other evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, we review the evidence "and inferences therefrom in the light most favorable to the nonmoving party." *See Bullington,* 186 F.3d at 1313.

Although the movant must show the absence of a genuine issue of material fact, the movant is not required to negate the opposing party's claim when the movant does not bear the ultimate burden of persuasion at trial. *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the movant carries the first indicated burden, however, the nonmovant cannot rest upon his or her pleadings, "but must set forth specific facts showing that there is a genuine issue for trial." *Bullington,* 186 F.3d at 1313. "Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III. FERPA

At the time Appellant brought this appeal, this court had held that a violation of the FERPA section at issue, § 1232g(b)(1), is actionable under § 1983. *See Falvo v. Owasso Indep. Sch. Dist.,* 233 F.3d 1203, 1212–13 (10th Cir.2000), *rev'd on other grounds,* 534 U.S. 426, 122 S.Ct. 934, 151 L.Ed.2d 896 (2002). The Supreme Court subsequently has held, however, that FERPA's nondisclosure provisions "create no rights enforceable under § 1983." *Gonzaga Univ. v. Doe,* —— U.S. ——, 122 S.Ct. 2268, 2279, 153 L.Ed.2d 309 (2002). Accordingly, we affirm judgment for Appellees on the FERPA claim, although on a different ground than relied upon below.

## IV. Fourteenth Amendment

Before the district court, a component of Appellant's § 1983 claim alleged that the District violated Scottie's right to privacy, as incorporated into the Due Process Clause of the Fourteenth Amendment. On appeal, she again raises her constitutional claim, but fails to argue that she is

bringing it under § 1983. Construing her cursory argument on the issue as a properly raised § 1983 claim for a violation of Fourteenth Amendment rights, we reject Appellant's claim.

Appellant claims that the following statements by Hansen on March 22, 1999, violated Scottie's constitutional rights:

(1) Scottie had no social skills;

(2) Hansen "held back" Scottie;

(3) Scottie should have stayed in kindergarten;

(4) Scottie "never should have gone to developmental first grade";

(5) Scottie was a "hellion" or frustrated;

(6) Scottie was a "bully";

(7) Scottie acted like Mr. King;

(8) Scottie was horrible or mean.

■■■ We recently considered whether school work and test grades of grade school students rose to the level of a "constitutionally-protected category of information" and concluded that there is no constitutional right of privacy in such information. *See Falvo,* 233 F.3d at 1208. We do not believe that a teacher's disclosure of information, observations, and impressions of students rises to the level of invading intimate privacies that have been recognized as part of the privacy penumbra of constitutional rights. *See Falvo,* 233 F.3d at 1209 (holding that grades were not so "highly personal or intimate" as to fall within zone of constitutional protection). Like the *Falvo* court, we believe that to recognize constitutional protection for such comments "would trivialize the Fourteenth Amendment." *Falvo,* 233 F.3d at 1209. Therefore, we affirm the

district court's grant of summary judgment to the District on Appellant's Fourteenth Amendment claim.

## V. Section 504 of the Rehabilitation Act

■■■ The District argued below and in its brief on appeal that the district court did not have jurisdiction over Appellant's disability discrimination claim because she had failed to exhaust her administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* The district court did not address this argument, because it found that Appellant had failed to state a prima facie case of discrimination under the ADA or Section 504 of the Rehabilitation Act of 1973. As this court must always satisfy itself of jurisdiction before addressing the merits of a claim, we turn to the exhaustion issue first. *See Hayes v. Unified Sch. Dist. No. 377,* 877 F.2d 809, 811 (10th Cir.1989) (addressing jurisdictional question of exhaustion before proceeding to merits of disability claim). We believe that both the language and the policy of the IDEA suggest that if a student with a disability seeks to bring a claim for educational injuries, then he must plead and show either that he has exhausted his administrative remedies under the IDEA or that the relief he is seeking his not available under the IDEA.[6] We agree with the District that Appellant was required to exhaust her administrative remedies before bringing her disability claims in federal court.

### A. *IDEA*

The IDEA, and its predecessor the Education of the Handicapped Act ("EHA"),

---

**6.** A plaintiff may also show that exhaustion would be either "futile or inadequate." *Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (discussing exceptions to exhaustion requirement under the IDEA's predecessor, the Education of the Handi-

capped Act). The party who is seeking to avoid exhaustion bears the burden of showing that one of these narrow exceptions applies. *Id.* Appellants have not made such a claim here, nor can we find support for such a claim in the record.

was designed "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE [7]] that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A) (2000). The statute defines a "child with a disability" as including a child [8] who has an "other health impairment" and "who, by reason thereof, needs special education and related services." *Id.* § 1401(3)(A)(ii). The IDEA's regulations, in turn, instruct that "other health impairment" means "having limited strength, vitality or alertness ... that [i]s due to chronic or acute health problems ... and [a]dversely affects a child's educational performance." 34 C.F.R. § 300.7(c)(9)(i)-(ii) (2002).

To ensure that children with disabilities were being afforded all of the educational benefits of the statute, Congress mandated, among other measures, a host of procedural safeguards, so that parents and advocates could participate fully in the design and implementation of the child's FAPE. *See id.* § 1415(a). These procedural safeguards include the right to examine all records and "participate in meetings with respect to identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child," *id.* § 1415(b)(1); the right to receive prior written notice when the school proposes to change or refuses to change the identification, evaluation, or educational placement of the child, *id.* 1415(b)(3)(A)-(B); and "an opportunity to present complaints with respect to any

matter relating to" the child's "identification, evaluation, or educational placement," *id.* § 1415(b)(6). If the school receives such a complaint, parents are given the opportunity to have an impartial due process hearing on the matter, *id.* § 1415(f), and the right to appeal any finding or decision reached in the hearing, *id.* § 1415(g).

As part of the bargain of providing children with educational rights and parents with procedural safeguards to protect those rights, Congress required that parents turn first to the statute's administrative framework to resolve any conflicts they had with the school's educational services. In pertinent part, the IDEA provides,

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking *relief that is also available under this subchapter*, the procedures under subsections (f) [due process hearing] and (g) [appeal] of this subsection shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*) (internal citations omitted) (emphasis added).

Congress added this exhaustion provision in response to the Supreme Court's opinion in *Smith v. Robinson*, 468 U.S.

---

7. The primary vehicle by which school districts provide a FAPE to students with disabilities is an Individualized Education Program ("IEP"). The IDEA provides a highly detailed scheme for the creation, implementation, and revision of students' IEPs. *See* 20 U.S.C. § 1414(d).

8. IDEA's provisions apply generally to children from ages 3 to 21. 20 U.S.C. § 1412(a)(1)(A).

992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), *superseded by statute as stated in Fontenot v. La. Bd. of Elementary & Secondary Educ.*, 805 F.2d 1222, 1223 (5th Cir.1986), in which the Court held that the EHA was "the exclusive avenue" through which to pursue a claim regarding the provision of publicly funded special education. 468 U.S. at 1013, 104 S.Ct. 3457. Following *Smith,* Congress passed the Handicapped Children's Protection Act of 1986, Pub.L. No. 99–372, 100 Stat. 796 (codified at 20 U.S.C. § 1415), preserving judicial review and "clarify[ing] that the EHA [did] not provide the exclusive remedy" for such claims, but requiring exhaustion for relief that was also available under the EHA. *Hayes,* 877 F.2d at 812. "Congress read the Supreme Court's decision in *Smith* and acted swiftly, decisively, and with uncharacteristic clarity to correct what it viewed as a judicial misinterpretation of its intent." *Id.* (quoting *Fontenot,* 805 F.2d at 1223).

Besides the statute's straightforward and explicit requirement that plaintiffs exhaust administrative measures for available relief before filing a civil action, the policy supporting the exhaustion requirement also counsels that parents turn first to educational professionals, as opposed to courts, to remedy disputes over a child's education. The IDEA's design provides a "carefully structured procedure for administrative remedies," which encourages parents to seek relief quickly when the injury occurs and "allows the educational system to bring its expertise to bear in correcting its own mistakes." *Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.,* 288 F.3d 478, 486 (2d Cir.2002). In adding the exhaustion provision, Congress

stressed the primacy of administrative remedies, stating that "nothing [in the 1986 amendment] should be interpreted to allow parents to circumvent the due process procedures and protections created under the EHA." S.Rep. No. 99–112, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1798, 1805. Indeed, the IDEA's exhaustion requirement wisely gives educational professionals, well-versed in a child's educational needs and the range of educational services that could ably meet those needs, "at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68,* 98 F.3d 989, 992 (7th Cir.1996).[9]

Aside from the unique advantages realized by the student from having educational experts address the shortcomings in the student's education in the first instance, other benefits flow from requiring exhaustion of administrative remedies, such as allowing the agency to exercise its discretion and correct its own mistakes, and to develop technical issues and a factual record fully prior to court review. "Allowing plaintiffs to bypass the administrative process en route to state or federal court . . . shifts the burden of factfinding from the educational specialists to the judiciary," thereby "disrupt[ing] [the IDEA's] carefully calibrated balance" of providing judicial review only after administrative remedies have been exhausted. *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 61 (1st Cir. 2002). The factual record developed is "an invaluable resource for a state or federal court required to adjudicate subsequent civil action covering the same terrain." *Id.* Exhaustion generally "is credited with pro-

---

**9.** When it comes to the needs of children with disabilities, the need for swift application of this expertise carries "particular force," as an individualized strategy for the child's education can be "designed and implemented quickly." Terry Jean Seligmann, *A Diller A Dollar: Section 1983 Claims in Special Education Lawsuits,* 36 Ga. L.Rev. 465, 521 & n. 282 (2002) (citing studies reviewing efficacy of IEP and due process schemes).

moting accuracy, efficiency, agency autonomy and judicial economy," *Christopher W. v. Portsmouth Sch. Comm.,* 877 F.2d 1089, 1094 (1st Cir.1989) (citing *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)), and in the realm of special education, its benefits, both to the student and to the judiciary, prove to be even more valuable.

By the IDEA's terms, however, exhaustion is required only for relief that is also "available" under the subchapter detailing the IDEA's procedural safeguards. We turn our attention to the meaning of relief that is also "available" under that subchapter.

### B. *Available Relief*

■ We first address Appellant argument that relief is not "available" to them under the IDEA because Scottie has not previously been identified as eligible under the IDEA. There are two possible ways to define the persons to whom relief is available. One plausible interpretation, which Appellant advance, is that various administrative remedies must be available immediately to a person, thereby requiring that a student be already identified, evaluated, and receiving special education pursuant to IDEA. A broader interpretation is that if the type of claim the student is asserting is one for which the statute provides a remedy, notwithstanding that a child may have to go through several procedural steps to take advantage of that remedy, then relief is available to that student. Thus, a student with a disability who attempts to file a suit asserting that the school is not meeting his educational needs may have to first assert his rights to be evaluated for eligibility under the IDEA, before making appropriate demands for hearings and procedures to address that claim. Although the school bears the burden generally in identifying eligible students for the IDEA,

*see* 20 U.S.C. § 1412(a)(3) ("Child find"), a parent has the right to "present [a] complaint[ ] with respect to *any matter relating to* the identification [or] evaluation" of a child, *id.* § 1415(b)(6) (emphasis added), including a school's failure to evaluate or identify a child.

We adopt the broader construction and read "available" relief to mean relief that a plaintiff may seek even though he or she may first have to go through the administrative procedures required by the statute, including requesting that a child be evaluated for eligibility. The word "available" appears in the statute unqualified with other conditions, such as that the relief must be available to children already identified under the statute or that the relief must be available immediately. Almost all rights are conditioned upon a claimant taking steps to assert those rights, and we see requesting evaluation of a child with a disability as one of those steps necessary to assert his or her rights.

■ Second, we reiterate that "available" relief means " 'relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.' " *Padilla v. Sch. Dist. No. 1,* 233 F.3d 1268, 1274 (10th Cir.2000) (quoting *Charlie F.,* 98 F.3d at 992). "[T]he dispositive question generally is whether the plaintiff has alleged injuries that could be redressed *to any degree* by the IDEA's administrative procedures and remedies. If so, exhaustion of those remedies is required." *Id.* (emphasis added). Therefore, the IDEA's exhaustion requirement will not be excused simply because a plaintiff requests damages, which are ordinarily unavailable in administrative hearings held pursuant to the statute, *see e.g., Polera,* 288 F.3d at 486; *Frazier,* 276 F.3d at 59; *Sellers v. Sch. Bd.,* 141 F.3d 524, 527–28 (4th Cir.1998); *Charlie F.,* 98 F.3d at 991, if his alleged injuries could be

redressed under the IDEA. This approach of focusing on whether there is any relief available under the IDEA to remedy the injury, as opposed to the particular relief sought by the plaintiff, is "appropriate to ensure that the IDEA process is not ... short-circuited by a rush to court seeking damages." Seligmann, *supra* note 9, at 525–26. If, after exhausting his administrative remedies, a plaintiff wishes to pursue certain types of relief in court, the reviewing court will have the benefit of a well-developed administrative record in evaluating the case and determining what judicial relief, if any, is appropriate.[10]

■ The IDEA offers redress for claims whose "genesis and manifestation ... are educational." *Charlie F.*, 98 F.3d at 993. If "the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem." *Padilla*, 233 F.3d at 1274. Because "the IDEA offers comprehensive educational solutions," *Charlie F.*, 98 F.3d at 993, courts consistently have required exhaustion for alleged acts "that both have an educational source and an adverse educational consequence." *Id. See also Polera*, 288 F.3d at 488 (school district's alleged failure to provide "appropriate educational services"); *Frazier*, 276 F.3d at 57, 64 (school district's alleged "bungling" of student's education for five years); *Charlie F.*, 98 F.3d at 991–93 (teacher's instruction in fourth grade allegedly resulted in detriment to student's education). These cases all differ from the facts of *Padilla*, in which the plaintiff had suffered "severe physical, and completely non-educational, injuries." 233

F.3d at 1274. In *Padilla*, we limited our holding that exhaustion was unnecessary because relief for plaintiff's injuries was not available under the IDEA, to the "narrow circumstances" of that case, and stated that in cases, such as *Charlie F.*, where the alleged injuries were "educational in nature and therefore presumptively redressable through the IDEA's administrative procedures," that we would require exhaustion. *Id.* at 1275.

■ Finally, we reject the argument that exhaustion will be excused because relief is no longer "available" at the time the plaintiff seeks to file a civil suit if relief was available at the time the alleged injuries occurred. To hold otherwise would transform the IDEA's exhaustion requirement into a "hollow gesture." *Frazier*, 276 F.3d at 63. Plaintiffs

> should not be permitted to "sit on" live claims and spurn the administrative process that could provide the educational services they seek, then later sue for damages. Were we to condone such conduct, we would frustrate the IDEA's carefully crafted process for the prompt resolution of grievances through interaction between parents of [children with disabilities] and the agencies responsible for educating those children.

*Polera*, 288 F.3d at 490. *See also* Seligmann, *supra* note 9, at 525–26 (noting that measuring available relief at the time when the injury occurred ensures that "the IDEA process is not ... ignored, with the potential consequence of more educational harm being done to the child until no remedy but damages remain").

---

10. We have declined to decide whether damages are available in civil actions, properly filed after exhaustion, under the IDEA, and need not reach that question today. *See Padilla*, 233 F.3d at 1274 (declining to reach the issue and underscoring that its holding "simply recognizes the fact that even if damages are available under the IDEA they should be awarded in civil actions, not administrative hearings"). We have, however, squarely held that a plaintiff may not use § 1983 as a vehicle for remedying an IDEA violation. *Id.*

### C. *Application to Scottie*

The fact that Scottie has not been identified under the IDEA does not mean that relief for his claims is unavailable under the statute. He suffers from Epstein–Barr virus, which his doctor described as similar to mononucleosis, and which causes him "debilitating fatigue" if he sustains activity for even a short amount of time. This condition has not improved from fifth-grade to eleventh-grade, requiring him to receive homebound services for those years. He thus appears to be eligible under the IDEA as having an "[o]ther health impairment," which the statute's regulations define as having "limited strength [or] vitality . . . that [i]s due to chronic or acute health problems . . . and [a]dversely affects a child's educational performance." 34 C.F.R. § 300.7(c)(9)(i)-(ii). Appellant has not demonstrated that Scottie is ineligible under the IDEA, and Appellant states in her briefs that he "has never been assessed [for IDEA eligibility]." Therefore, Appellant could have filed a complaint with the District pertaining to his identification or evaluation under the statute, and then utilized the IDEA's procedural machinery to address the alleged deficiencies in the provision of his FAPE.[11]

Nor does the fact that Appellant seeks damages mean that relief under the IDEA is unavailable. On the face of the complaint, it is obvious that both the "genesis and manifestation" of Scottie's claims are educational in nature. *Charlie F.*, 98 F.3d at 993. Appellant contests the District's removal of Scottie's teacher, Heath, at the end of the 1999–2000 school year and its decision to replace Heath with a teacher that Appellant found "educationally incompatible" with Scottie. Further, Appellant alleges that the District provided teaching materials in a tardy fashion, and that it created an intimidating environment at Scottie's IAP meetings by allowing persons "not involved" in his education to attend. These alleged injuries, of inadequate instruction, delayed teaching materials, and intimidation tactics at annual reviews, all share an educational source and educational consequences. We find these claims to be squarely within the scope of available relief under the IDEA. This appears to be the classic case where pursuing administrative procedures at the time of the alleged wrongdoing could have allowed the District to address and remedy any shortcomings in Scottie's education.

Finally, it is unclear whether Scottie has graduated from high school and, therefore, whether Appellant could claim that the District can no longer provide any educational remedy to him. Neither party has briefed the issue, and in any event, we conclude that relief was available to Scottie at the time of the alleged educational deficiencies and, therefore, that he was required to exhaust administrative procedures.

We therefore conclude that Appellant must exhaust administrative remedies under the IDEA for claims of educational deficiencies before seeking relief for those claims in a civil suit.

### VI. Title VI

Appellant asserts that the district court erred in granting summary judgment to the District on her claim of racial discrimination under Title VI. Title VI

---

11. This case differs, therefore, from one in which a student is qualified under Section 504 of the Rehabilitation Act, but has been evaluated and found ineligible under the IDEA. We also are not faced with a situation where a parent has attempted to have her child evaluated for IDEA eligibility but has been thwarted by the school district's inaction.

provides that "[n]o person ... shall, on the ground of race ..., be excluded from participation in, denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The statute proscribes only intentional discrimination. *See Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir.1996). Even though Title VI's regulations also forbid discrimination that has a disparate impact, the Supreme Court has held that no "free-standing private right of action to enforce [these] regulations" exists.[12] *Alexander v. Sandoval*, 532 U.S. 275, 293, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Therefore, a plaintiff must demonstrate that there is a genuine issue of material fact that the program receiving federal assistance acted with discriminatory intent or motive to survive summary judgment on a Title VI claim.

Appellant bases her claims of discrimination primarily on the events surrounding the selection of Scottie's teachers. Essentially, she asserts that the District's removal of Scottie's teacher at the end of the 1999–2000 school year and replacement with a teacher that Appellant disapproves of amounts to discrimination on the basis of Scottie's race. Appellant also claims that the District was tardy in providing certain teaching aids and supplies, specifically math and science slides, a teacher's edition of an algebra textbook, and a TV/ VCR. Further, Appellant alleges that persons "not involved" in Scottie's edu-

cation were present at his Individual Accommodation Plan meetings for "intimidation purposes only."[13]

The district court concluded that on the facts presented, Appellant failed to carry her burden of showing sufficient evidence that these actions were discriminatory. We agree, finding that there is simply no evidence of discrimination based on race, nor any evidence that the District's actions were improperly motivated by race.

Appellant argues that the District's dismissal of Heath, Scottie's teacher for the 1999–2000 school year, amounts to discrimination. The District offered a neutral reason for this action, that it has a policy of not employing felons, which Appellant has failed to rebut. We fail to see how dismissing a teacher pursuant to a District policy of not employing felons amounts to racial discrimination.

Similarly, the District's decision to have Luster serve as Scottie's teacher for his junior year, instead of the candidate Appellant suggested, does not rise to the level of discrimination. Appellant has not presented any evidence that other students were allowed to hand-pick their teachers. Finally, Appellant claims that persons were present at Scottie's IAP meetings for "intimidation purposes" only. The District presented the associate superintendent's affidavit that all of the people present at the IAP meetings "represented various aspects of Scottie's education." Again, Appellant failed to provide any evi-

---

**12.** Appellant brought a claim only under Title VI itself, and not under its regulations.

**13.** Appellant also mentions in passing that the following actions constitute discrimination: (1) Scottie was not given credit for a course he completed during a semester; (2) Scottie received only one academic award which was not signed by a District administrator or official; and (3) the District reported Scottie truant. Appellant has failed to provide factu-

al support for the first and third allegations, however, and neglected to articulate how the second allegation constitutes discrimination. Because an appellant bears the responsibility of tying the relevant facts, supported by citations to the record, to his legal contentions, *United States v. Rodriguez–Aguirre*, 108 F.3d 1228, 1238 n. 8 (10th Cir.1997), we devote our attention to the issues which Appellant adequately briefed.

dence that the people were not authorized by District policy to be present at the meetings, nor that their presence represented a change in custom following her complaints about Heath's replacement. She alleges that the meetings became "very harassing and intimidating" but provides no specific facts to support this claim. In short, these vague allegations represent nothing that would begin to approach discrimination. In sum, Appellant failed to allege sufficient evidence to suggest that the District excluded Scottie from participation in, denied him the benefits of, or subjected him to discrimination with respect to his education on the ground of race.

On appeal, Appellant contends that the district court failed to evaluate the "impact of the official action of the District, the historical background of the District's actions, the sequence of events leading up to the challenged conduct and any departures from [the] normal decision-making process," as the decision in *Village of Arlington Heights v. Metropolitan Housing De-*

*velopment Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), requires. It is Appellant's burden to show discrimination, however, and she did not provide the district court with any of this background information.

Appellant has failed to show that the incidents she complains of amount to discrimination, much less intentional discrimination on the basis of race. Because she has failed to show how Scottie was treated differently than students who are not African–American, we find that she has not presented a colorable claim under Title VI.

## VII. Conclusion

We affirm the district court's grant of summary judgment to Appellees on all claims.