In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 05-3700

BOARD OF EDUCATION OF TOWNSHIP
HIGH SCHOOL DISTRICT NO. 211,

*Plaintiff-Appellee*,

*v.*

MICHAEL and DIANE ROSS, individually and
as next friends of LINDSEY ROSS, a minor,[1]

*Defendants-Third-Party Plaintiffs-Appellants,*

*v.*

ILLINOIS STATE BOARD OF EDUCATION,

*Third-Party Defendant-Appellee.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 6098—**Matthew F. Kennelly**, *Judge.*

————————

ARGUED SEPTEMBER 21, 2006—DECIDED MAY 11, 2007

————————

[1] In cases involving minors, we generally refrain from revealing the minor's last name. We make an exception here because this opinion is being issued in tandem with a companion case, *Ross v. Board of Education of Township High School District 211* ("*Ross II*"), No. 06-2060, in which Lindsey Ross is identified by her full name for the simple reason that *Ross II* was filed after Lindsey had reached the age of majority. Because Lindsey's full name is made public in *Ross II*, we see no harm in using her last name here as well. We therefore do so for the sake of clarity and consistency.

Before BAUER, CUDAHY, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case is about the responsibility of a public school district to provide an education to a student afflicted with Rett syndrome, which is a "neurodevelopmental disorder characterized by normal early development followed by loss of purposeful use of the hands, distinctive hand movements, slowed brain and head growth, gait abnormalities, seizures, and mental retardation." See National Institute of Neurological Disorders and Stroke, Rett Syndrome Fact Sheet, http://www.ninds.nih.gov/disorders/rett/detail_rett.htm?css=print (visited April 9, 2007) ("Rett Syndrome Fact Sheet"). The student's parents, Michael and Diane Ross, believed that High School District No. 211 failed to provide their daughter, Lindsey, who suffers from Rett syndrome, with the free appropriate public education in the least restrictive environment to which she is entitled under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1414. An independent hearing officer held a lengthy hearing and upheld the District's placement of Lindsey. Both the District and Lindsey's parents then turned to the district court, which granted summary judgment to the District on all counts.

Shortly after the district court issued its opinion in this case, Lindsey and her parents filed a second lawsuit against the District and its Director for Special Education. As we explain in the companion opinion issued today in *Ross II*, the district court dismissed most of the claims in the second case on the basis of claim preclusion; it dismissed some supplemental state claims without prejudice. While we appreciate that Lindsey's parents sincerely believe that her best interests would have been served better under a different plan, we conclude that the district court in both cases correctly held in favor of the school authorities and we therefore affirm.

**I**

In approaching this kind of case, a district court must take as the basis of its decision the administrative record that the independent hearing officer compiled; it then has the discretion to admit additional evidence to supplement the record. 20 U.S.C. § 1415(i)(2)(C). Once the record is complete, the court is to base its decision on "the preponderance of the evidence" and to grant "such relief as [it] determines is appropriate." *Id.* The Supreme Court has interpreted this to require the initial reviewing court—that is, the district court—to make an independent decision based on the preponderance of the evidence. See *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). At the same time, the court must give "due weight" to the determinations made during the state administrative process. *Id.* The *Rowley* Court emphasized that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* See *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 466 (7th Cir. 2000).

*Rowley* described the reviewing court's task as follows:

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206-07. We have interpreted this to mean that we should review the administrative record and the

district court's findings of fact deferentially. We will reverse only if those findings are clearly erroneous. See *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1053 (7th Cir. 1997). We review questions of law, as usual, *de novo*. Like the district court, we must refrain from imposing our own notions of sound educational policy for those of the responsible school authorities. *Id.* at 1052-53. We note as well that at the administrative level, the Supreme Court has held that the burden of proof in a hearing challenging an educational placement decision is on the party seeking relief. See *Schaffer ex rel. Schaffer v. Weast*, 126 S.Ct. 528, 531 (2005). In this case, the parties seeking relief (in the form of a different placement for Lindsey) were Lindsey and her parents; under *Schaffer*, they had the burden of proof.

## II

Victims of Rett syndrome are almost all female, because it is caused by mutations on a gene found on the X chromosome—males with the damaged gene usually die shortly after birth. See Rett Syndrome Fact Sheet. The severity of any given person's disease varies. The district court described Lindsey's condition as follows:

> Lindsey is nonverbal and suffers from apraxia, an inconsistent ability to control the body and limbs. She has, however, a higher level of motor functioning than the majority of girls with Rett Syndrome; among other things, Lindsey can swim, ski, and ride a horse. Lindsey also has a higher level of cognitive functioning than most girls with Rett Syndrome. Though the average mental age of girls afflicted with Rett Syndrome is estimated to be eight to ten months, doctors estimate Lindsey's cognition to be between the seven and twelve year old equivalency. . . . It should be noted, however, that because girls with Rett Syndrome

are nonverbal and have poor motor control, it is quite difficult to measure their cognitive ability accurately.

Among the many effects of Rett Syndrome are that Lindsey's hands get locked together, and she needs assistance in unlocking them. In addition, and perhaps significantly for purposes of this case, Lindsey engages in vocalizations, which can be loud and last for anywhere from a few seconds to over a minute. The cause and meaning of the vocalizations is not known with any certainty. Rett Syndrome also causes Lindsey to engage in self-injurious behaviors, which include hitting herself on the chin or head, the cause of which is also unknown. Lindsey also sometimes strikes others, usually by butting them with her head.

Until she entered high school, Lindsey attended regular public schools in her neighborhood—in educational jargon, she was "mainstreamed." In the fall of 2001, she entered James B. Conant High School, in Hoffman Estates, Illinois; Conant is one of the five high schools within District 211. That year, she was placed in five regular education classes; she received extensive assistance from her own special education teacher and teacher's aide, who accompanied her throughout the day. They provided whatever academic or physical services she required, including behavioral interventions, calming measures, assistance with hygienic needs, and help with communication devices. Conant provided a work room for her private use, for times when she needed individualized instruction or she had to be separated from the other students. Occasionally, separation became necessary. For example, in May of her freshman year, she head-butted two staff members, causing nasal fractures in both. Following these incidents, she was removed from Conant. Over the summer, her parents had her evaluated by a specialist in Alabama, who recommended continued monitoring. At approximately the same time, the District arranged for a multidisciplinary

review of Lindsey's case to be conducted by Dr. Bennett Leventhal and Dr. Marrea Winnega of the University of Chicago Developmental Disorders Clinic. This review concluded that Lindsey's behavior was interfering with her ability to make educational progress and recommended that she be taken out of Conant and placed in a special education setting.

On August 23, 2002, the District held a meeting for the purpose of reviewing Lindsey's "Individualized Education Plan" (IEP) for her upcoming sophomore year. The District recommended special placement, but Lindsey's parents strongly maintained that she would be better off remaining at Conant. They requested an administrative hearing and indicated that they wanted to exercise the "stay put" provision of the IDEA, 20 U.S.C. § 1415(j), under which an eligible student remains in her current school or program during the pendency of an administrative hearing. Litigation erupted at that point: the District filed suit in the federal district court, asking it to prohibit the parents from invoking the "stay put" provision. The court granted a temporary restraining order, but matters calmed down somewhat when the parents decided to keep Lindsey at home rather than put her in the special education setting.

Under a compromise memorialized in an agreement dated November 5, 2002, the parties agreed that Lindsey was to be returned to Conant as soon as possible. The parties also agreed to submit the question of Lindsey's placement to a panel of three experts, Dr. Leventhal, Victor Morris (a specialist in educational and behavioral programming for students with autism spectrum disorders, including Rett syndrome), and Alice Belgrade (a behavioral specialist with teaching experience). The panel members did not work well together. Nonetheless, they were able to agree that Lindsey could return to Conant in the spring of 2003. She did so effective April 21, with a

shortened schedule of three periods (lunch, physical education, and English). As before, she had a special education teacher and a teacher's aide to assist her.

Lindsey attended school for 35 days under that arrangement. Logs kept by her special education teacher reflected the fact that she spent most of her time in her private work room, rather than in the classroom, because her self-injurious behavior or disruptive vocalizations often required her to leave the other students. Her academic progress was limited, but she improved various functional skills such as using a spoon, sorting, and responding to personal greetings. According to her parents, more could have been accomplished if the District had kept its word in other respects. They accuse the District of failing to provide some of the aids and services that it had promised, such as the creation of a special "Circle of Friends" to facilitate peer interaction, occupational therapy, and a properly fitting weighted vest (which was used to help calm her). She completed her sophomore year in June 2003. Over the summer, her special education teacher decided not to return to District 211, and the District decided not to rehire the teacher's aide. It hired replacements for both. Lindsey's parents believe that the departure of the teacher and the aide was a blow to Lindsey's progress, since she had developed an excellent rapport with them.

In August 2003 the IEP team met to decide how to structure Lindsey's junior year. The team initially included Lindsey's parents, their attorney, the assistant director of special education for the District, the District's attorney, two members of the expert panel, Lindsey's English teacher, and her physical therapist. Morris, one of the panel members, resigned because of his disagreements with the others over the best course of action for Lindsey. The result of these meetings was the District's acquiescence in the plan proposed by Lindsey's parents, under

which she was to return to Conant in the fall and take a full day of classes.

Soon after the 2003-04 school year began, it became apparent that Lindsey was having problems. She was often tardy to class; her classroom behavior deteriorated; she suffered from medical problems; perhaps because of those complications she was fatigued and unsteady on her feet; and her motor skills seemed worse. The net result was that she was in school for the full six periods on only five days during September and October. The new teacher and teacher's aide did not respond to these problems as effectively as the parents believed they should, nor did they try hard enough (in the parents' opinion) to win Lindsey's trust. The District decided to convene a meeting of the IEP team on November 5, 2003. Opinions differed on the question whether Lindsey should stay at Conant or be moved to a special education setting. At the end of that meeting, the District decided to change her placement to a "multiple needs" program; it recommended the one provided by Lake Park High School, which is run by the North DuPage Special Education Cooperative.

Lindsey's parents opposed that recommendation, but the District evidently thought—at least by the end of that meeting—that the time for discussion was over. Indeed, the parents assert that the November 5 meeting itself was a sham and that the District had already decided to take Lindsey out of Conant. As proof, they point to the fact that the District had "stationed its attorney at the federal courthouse with instructions to file a previously prepared lawsuit against the parents" in case they did not acquiesce in its decision. In fact, that suit was filed and the District sought an emergency motion to permit it to move Lindsey. (This is why the District appears in this litigation as the plaintiff and the parents as defendants.) Not long afterwards, Lindsey's parents filed a request for administrative review, as they were entitled to do

under federal and state law. See 20 U.S.C. § 1415(b)(6); 105 ILCS 5/14-8.02.

The independent hearing officer, Carolyn Smaron, heard testimony for 42 days, making Lindsey's the longest special education due process hearing in Illinois history, according to the district court. The hearing officer issued a 61-page decision in which she concluded that the District's placement decision was appropriate. Lindsey's parents appealed that decision to the district court under 20 U.S.C. § 1415(i)(2)(A). In addition to asking for various forms of relief against the District, the parents also filed a cross-claim against the Illinois State Board of Education (ISBE), in which they alleged that ISBE violated the IDEA, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to ensure that the District educate Lindsey at Conant. As noted earlier, the district court took some additional testimony before rendering its decision. On cross-motions for summary judgment, it denied the parents' motion and granted the District's motion. It also found that its ruling in the District's favor required judgment in ISBE's favor on the third-party claim. Lindsey's parents now appeal to this court.

## III

The IDEA guarantees disabled children the right to a free appropriate public education in the least restrictive environment. In order to implement that promise, § 1414 of the Act requires a school district to assess the child's educational needs and to develop an IEP based on that assessment. *Rowley* makes clear that the statute imposes both a procedural obligation and a substantive obligation on the state. 458 U.S. at 207-08. Lindsey's parents, on their own and her behalf, argue that the

District failed to satisfy the statute in either respect. We address their arguments in turn.

A. Procedural Compliance

The parents claim that the meetings that the District held—especially, but not only, the meeting of November 5, 2003—were nothing but an elaborate effort to ratify a decision that the District had already made without their input. If this were true, then it would violate the IDEA. The central tool that the statute uses for the development of a proper educational program for each disabled child is the IEP, which is defined as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14). The IDEA lays out an elaborate set of procedures that govern the process of developing an IEP. See 20 U.S.C. § 1414(a)-(c). Throughout, the statute assures the parents an active and meaningful role in the development or modification of their child's IEP. If a school district were to change a student's placement without observing those rules, it would violate the procedural obligations under the statute to which *Rowley* referred. See *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004); *Spielberg ex rel. Spielberg v. Henrico County Pub. Schs*, 853 F.2d 256 (4th Cir. 1988) (construing Education of All Handicapped Children Act, predecessor to IDEA).

While we can appreciate the frustration that Lindsey's parents felt at the conclusion of the November 5 hearing, we cannot say that the district court clearly erred when it found that they had a meaningful opportunity to participate in the development and review of Lindsey's IEP. The parents point to three pieces of evidence that contradict this finding, in their opinion. First, during the August

2003 IEP meeting, district officials left the room and drafted an addendum to the plan that read as follows:

> By the end of her ninth grade year . . . staff members who worked closely with Lindsey sincerely believed she was receiving virtually no educational benefit in the mainstream. Based on these beliefs, public school personnel recommended a placement at a separate school designed to appropriately meet Lindsey's needs. . . .

> [T]he belief among District 211 staff that Lindsey is not being appropriately served in the mainstream still exists. . . . However, staff is also advised by legal counsel that the settlement agreement continues to control and therefore they will in good faith implement whatever IEP is agreed upon today. Were it not for the settlement agreement, as a matter of conscience, public school personnel would continue to recommend an appropriate public or private self-contained setting.

The parents concede that this language did not effect a change in Lindsey's plan. The district court should have used it, they believe, as evidence that District 211 had predetermined Lindsey's placement at some time prior to the November 5 meeting. While it may be possible to view the addendum that way, it is certainly just as reasonable (if not more so) to take it, as the district court did, at face value: a sincere expression of concern on the part of staff, a staff recommendation, and a commitment to abide by whatever plan was "agreed upon today."

Second, the parents claim that Dr. Malito, the District superintendent, told them at an October 2003 meeting that District 211 had made up its mind to remove Lindsey from Conant and change her placement to a special needs program after the November 5 meeting. Dr. Malito, however, later testified that he did not make any such statement at the October meeting and that he did

not predetermine Lindsey's placement before the November meeting. Dr. Daniel Cates, the Director of Special Education for District 211, was present at the October meeting and testified that no decisions regarding placement were made then. The state independent hearing officer credited Dr. Cates's testimony, and the district court saw no reason to question her credibility determination.

Finally, the parents regard the fact that the District had already drafted the legal papers necessary for seeking an injunction against the "stay put" obligation as of the day of the November 5 meeting, and that it had an attorney poised to file those papers, as unequivocal evidence that the meeting was a sham. Once again, while this may be one way of looking at the evidence, it is not the only way, and most importantly, it is not the way that the hearing officer saw it. The District had no reason to contemplate litigation against itself if the parents' views had prevailed at the end of the meeting. In that event, presumably it would have notified the attorney to go home. If at the end of the meeting the consensus was to change Lindsey's placement, however, the District well knew that the parents were likely to oppose that outcome. The hearing officer, and the district court, were not required to read anything nefarious into its decision to be ready for the latter alternative.

In fact, the hearing officer thought that the evidence was "overwhelming that the parents were maximally involved in the IEP process, its implementations and modifications." The district court agreed with that assessment. District 211, in its view, had done nothing more than prepare for the various IEP meetings—a step it was entitled to take. The court also noted that the District's decision to file the lawsuit was made by Dr. Cates and that the members of Lindsey's IEP team had no knowledge of the plan to sue if consensus was not

reached at the November meeting. The record reflects that the parties conducted a comprehensive review of Lindsey's situation at that meeting; the review was memorialized in a 32-page conference summary report that reflects discussion among the expert panel members, consultants, psychologists, Lindsey's case manager, her parents, and her parents' attorney. This is a far cry from *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, in which the Ninth Circuit found that the record supported the district court's finding that the school authorities had independently developed the IEP that it presented to the parents without either their participation or that of certain other critical parties. 960 F.2d 1479, 1484 (9th Cir. 1992).

### B. Substantive Compliance

The parents raise three principal arguments with respect to the substance of Lindsey's IEP: first, that the District violated the IDEA by failing to include a transition plan for her; second, that it failed to consider all supplementary aids and services that could be used at Conant, and thus failed to educate Lindsey in the least restrictive environment; and third, that the District also violated Lindsey's rights under the ADA and the Rehabilitation Act.

#### 1. Transition Plan

The IDEA requires every IEP, beginning no later than the one that will be in effect when the child is 16 years old, to include "appropriate measurable postsecondary goals based on age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills," and to describe the "transition services (including courses of study) needed to

assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb). Nothing in the statute indicates that the District has discretion whether to include a transition plan in the IEP. See *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996) ("If a student is eligible under IDEA, appropriate services, including transition benefits, shall be provided.").

In Lindsey's case, this means that transition measures should have been discussed in the IEP prepared for her sophomore year in August 2002. The district court essentially conceded that this had not happened. Instead, the record reflected that her transition plan was "deferred," without explaining where the authority to take that step came from. The District had explained that it followed a practice of deferring the drafting of transition provisions where the student was not ready to move along, and the district court found that "it was reasonable for the District to determine that Lindsey has not yet progressed to the point at which a transition plan is necessary." The August 2003 IEP was not much better. It said, "Transition goals will be determined after Lindsey completes a vocational assessment. Until this point, transition planning will be addressed through IEP goals in the areas of self-help and functional academics. A district representative will meet with the family in order to address the various domain areas of transition." Another document indicates that meetings about transition were taking place and that the parents had received some literature about transition. In the November 2003 IEP, the plan reverted to a statement that transition planning was being "deferred."

It appears that the District thought that what Lindsey needed was the very basic skills that were already included in her IEP, and thus that there was no material difference between her transition needs and her current needs. Even if that were true, however, the statute says

that it should have explained this in the IEP and addressed the subject more fully. The failure of the plan to discuss transition is, however, a procedural flaw, not a substantive one: no one would be complaining about the language of the plan if the District had in fact been providing transitional services to Lindsey. The important question is therefore whether the District failed to give Lindsey something to which she was entitled. As we noted in a similar case, "Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a [free appropriate public education]." *Heather S.*, 125 F.3d at 1059. See also *Deal*, 392 F.3d at 855.

The record as a whole shows that Lindsey was not in a position to benefit from an elaborate transition plan including advanced vocational or educational skills. This explains why the District was deferring a plan with anything more elaborate than what it was already doing, and it explains why both the hearing officer and the district court found this course of action acceptable. We conclude that the District erred when it failed to include more specific transition plans in Lindsey's IEPs, but that this procedural flaw did not result in the denial of a free appropriate public education for her.

### 2. Least Restrictive Environment

The hearing officer and the district court devoted a great deal of attention to this argument. Under the IDEA and its implementing regulations, a child is entitled to receive a free appropriate public education, and it must be delivered in the least restrictive environment. This part of the IDEA requires the District to educate Lindsey with her nondisabled peers—known as "mainstreaming" her—to the

"greatest extent appropriate." 20 U.S.C. § 1412(a)(5)(A). The statute specifies that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [may] occur[ ] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* Lindsey's parents argue that District 211 failed to comply with this obligation, both by its inadequate support of Lindsey while she was at Conant and by its ultimate decision to move her out of the mainstream school. This court has declined to adopt any sort of multi-factor test for assessing whether a child may remain in a regular school. See *Beth B. v. Van Clay*, 282 F.3d 493, 499 (7th Cir. 2002). We did hold, however, that it is not enough to show that a student is obtaining *some* benefit, no matter how minimal, at the mainstream school in order to prove that the District's removal of Lindsey violated the "least restrictive environment" requirement. Instead, giving due deference to the administrative findings and the conclusions of the district court, we ask whether the education in the conventional school was satisfactory and, if not, whether reasonable measures would have made it so. If the mainstream environment was satisfactory, the District violated the statute by removing Lindsey. *Id.* at 499. If it was not and could not reasonably be made so, the District satisfied the statute if its recommended placement kept Lindsey with her nondisabled peers to the maximum appropriate extent. *Id.*

The district court, relying heavily on the hearing officer's decision, found the measures that District 211 used to facilitate Lindsey's education to be sufficient; it also found the District's decision ultimately to move her to be consistent with the statute. Rather than repeat everything from the district court's thoughtful analysis, we mention only a few examples of the evidence that supported this finding.

Lindsey, the district court found, was not making meaningful progress at Conant. To the extent that she was successful during the spring of 2003, she was meeting her goals through work done in her private room with instruction from her special education teacher, not through work done in the mainstream classroom. School records reflect that she spent little time in the regular classroom throughout 2003. During the spring of 2003, for example, there were only two days in which she was able to stay in her English class for the full 50 minutes, and there were many days when she could not go at all or she went for only about 10 minutes. Her ability to interact with her peers was also minimal, and her behavior was disruptive. Even though her cognitive ability is fortunately higher than that of many Rett's sufferers, this does not answer the question where her intellectual development could be fostered most effectively. The record is full of evidence that outside experts, the District 211 teachers, and district specialists all thought that she could not learn satisfactorily in the environment of Conant. Moreover, several experts, the hearing officer, and the district court concluded that Lake Park High School, the recommended placement school, presented "reverse mainstream opportunities," which allow for integration into the regular education environment and periodic interaction with nondisabled students. If this evidence is credited, it is easy to conclude that the District met its obligations to provide Lindsey a free appropriate public education in the least restrictive environment she could handle. Her parents obviously disagree with this, but we cannot undertake an independent assessment of Lindsey's case. We can only decide whether the hearing officer and the district court came to a rational conclusion, and we find that they did.

### 3. ADA and Rehabilitation Act

The district court held that its decision to reject the challenge by Lindsey and her parents based on the IDEA necessarily meant that their case under the ADA and the Rehabilitation Act also had to be rejected. They argue that this fails to recognize important differences between the statutes and ignores the savings clause in the IDEA, which says that nothing in that act "shall be construed to restrict or limit the rights, procedures, and remedies available under . . . the [ADA], Title V of the Rehabilitation Act of 1973, [or other laws]." 20 U.S.C. § 1415(l) (citations omitted); see also *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir. 1996). The IDEA is limited, we held in *Charlie F.*, to "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 98 F.3d at 991.

The parents read this to mean that the possibility of a different remedy (specifically, damages) under the ADA or the Rehabilitation Act opens up the possibility of their use here. They state that they are seeking redress for "acts of hostility and discrimination for which monetary relief is the only salve." We agree with her parents this far: insofar as claims under these two statutes are concerned, the district court was required to apply the ordinary standard for summary judgment, not the special IDEA variant. That means also that our review is *de novo* on this part of the case, as it ordinarily is on appeals from summary judgments.

In our view, the district court was aware of this and applied the correct standard. It found, for example, that no reasonable trier of fact could find that District 211 intentionally discriminated against Lindsey. Nothing in the court's language suggests that it was deferring to anyone or that it was resolving disputed issues of material

fact. Moreover, this conclusion is unassailable. Lindsey and her parents are complaining that the level of special services she received was not high enough; nothing whatever suggests that the school was treating her differently from the other students in an adverse way, intentionally or otherwise. If the question were whether it was making reasonable accommodations to help her participate in its programs, that too cannot be disputed on this record. What is in dispute, as the district court recognized, is whether the *extra* efforts required by the IDEA were satisfactory. That does not mean, however, that the disputed issues of fact to which the court referred are material for an ADA or a Rehabilitation Act theory. We add, for the sake of completeness, that we are not rejecting this argument just because Lindsey's parents did not specify the monetary damages that they were seeking under these alternative theories. As they correctly note in their reply brief, FED. R. CIV. P. 54(c) entitles them to whatever relief may be justified by the proof. We conclude, however, that the District was entitled on the merits to summary judgment under these two theories.

## IV

Last, we turn to the third-party claim against the Illinois State Board of Education, in which Lindsey's parents accused it of violating the IDEA, the ADA, and section 504 of the Rehabilitation Act by failing to ensure that District 211 complied with the "least restrictive environment" command of the IDEA and by failing to provide a fair administrative process. We agree with the district court that these claims necessarily fail as a result of our rejection of the primary claims against the District.

\* \* \*

We AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*