In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1013

N.T. and P.T., individually and as parents and next friends of C.T.,

*Plaintiffs-Appellees*,

*v.*

GALESBURG COMMUNITY UNIT SCHOOL DISTRICT NO. 205,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:24-cv-04124-JEH — **Jonathan E. Hawley**, *Judge*.

ARGUED SEPTEMBER 11, 2025 — DECIDED MAY 6, 2026

Before BRENNAN, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges*.

BRENNAN, *Chief Judge*. C.T. is an elementary school student with disabilities. Due to his behavioral struggles, his parents agreed to place him in a special education class at his local elementary school in Galesburg, Illinois. Three weeks later, the school district proposed its first Individualized Education Plan. This would have placed him, against his parents'

wishes, at a private therapeutic day school in a different school district in Peoria, Illinois. Rather than walk to his local school, C.T. would ride a bus more than 45 minutes each way.

Believing this violated C.T.'s rights under the Individuals with Disabilities Education Act, his parents requested a due process hearing. After several days of testimony, an independent hearing officer concluded that the school district had complied with the Act. C.T.'s parents then sought judicial review. The district court conducted a bench trial and reversed the hearing officer's decision. The court concluded that the school district's attempt to place C.T. at the therapeutic day school would violate his right to an education in the least restrictive environment. Because the district court's decision involved no mistakes of law and was not clearly erroneous, we affirm.

## I. The IDEA

Under the Individuals with Disabilities Education Act (IDEA or the Act), a state may receive federal funding to educate children with disabilities as long as it adheres to certain conditions. 20 U.S.C. § 1412(a). Illinois has accepted such federal funds, so it must comply. *Id*. The IDEA and its implementing regulations provide two substantive requirements. States shall provide eligible students with a free appropriate public education (FAPE), 20 U.S.C. § 1412(a)(1), in the least restrictive environment (LRE), 20 U.S.C. § 1412(a)(5).

Under the LRE provision, states can remove a child from the "regular education environment" and place him into "special classes," "separate schooling," or other restrictive options, only when "the nature or severity of the disability … is such that education in regular classes with the use of

supplementary aids and services cannot be achieved satisfactorily." *Id*. States shall also mainstream students with disabilities—that is, provide them an education with non-disabled peers—to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). To these ends, states must make available "a continuum of alternative placements," ranging from more to less mainstreamed. 34 CFR § 300.115.

To provide a compliant education, schools evaluate whether a child qualifies for special education. 20 U.S.C. § 1414(a)–(c). If a child is eligible, the schools craft an individualized education program, commonly referred to as an IEP. 20 U.S.C. § 1412(a)(4). This is a "written statement … developed, reviewed, and revised" by a team of stakeholders. 20 U.S.C. § 1414(d)(1)(A)(i). An IEP team includes a child's parents, teachers, and other qualified educators. 20 U.S.C. § 1414(d)(B). An IEP must be tailored to meet the individual needs of the disabled child by stating the student's present levels of performance, setting measurable annual goals, and explaining how progress toward meeting those goals will be measured. 20 U.S.C. § 1414(d)(1)(A)(i). It must also list the special education and related services, along with any additional support and services, that each disabled student will receive. *Id*.

Parents who believe an IEP violates their child's statutory rights are entitled to review. Relief may be sought in state administrative proceedings. 20 U.S.C. § 1415(f)(1)(A). Illinois enacted qualifications and guidance for the independent hearing officers who conduct such proceedings. 105 ILCS 5/14-8.02c. Any party "aggrieved by the findings and decision" of a hearing officer may sue in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

In such cases, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The party challenging the outcome of the administrative hearing bears the burden of proof. *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004) (citation omitted). Though the district court independently evaluates the witnesses and evidence and can expand the record with an evidentiary hearing, the hearing officer's findings and decision are still entitled to "due weight." *See Alex R.*, 375 F.3d at 612 (7th Cir. 2004) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)); *see also Beth B. v. Van Clay*, 282 F.3d 493, 497 (7th Cir. 2002). And though Congress authorized courts to base their decisions on the preponderance of the evidence, this is not "an invitation" for courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

## II. Background

When this dispute began, C.T. was a six-year-old student in the first grade.[1] According to his parents and educators, C.T. enjoys science and shows promise in math. He displays good motor and problem-solving skills, and he possesses a strong vocabulary and good sense of humor. Yet due to his attention deficit hyperactivity disorder, mild oppositional defiant disorder, generalized anxiety, and sensory disturbance, C.T. often struggles with aggression, leaves the classroom,

---

[1] C.T. is currently nine years old and enrolled in third grade.

refuses work, and interacts negatively with peers and supervising adults. At times, his behavior has escalated to cursing and physical violence, including kicking and throwing classroom items, causing minor injuries to staff.

## A. Behavior Interventions

Thus far, C.T.'s education has included several interruptions and interventions. He briefly entered kindergarten at Silas Willard Elementary before transferring to King Elementary. Due to behavioral issues in the regular classroom at King, the principal and other administrators took turns providing dedicated one-on-one support to C.T. throughout the day.

That fall, after C.T. started first grade, the Galesburg Community School District conducted a Functional Behavior Assessment and instituted a Behavior Intervention Plan for C.T. His behavioral struggles continued, however. Seeking resolution, the school district and C.T.'s parents entered a mediation agreement. That placed him back at Silas Willard in a self-contained classroom for students with emotional and behavioral disorders ("EBD").

The EBD classroom provides embedded social-skills training and therapeutic activities. At the time, it consisted of seven students, a special education teacher, and two paraprofessional aides. Several students at Silas Willard also receive individualized support from dedicated one-on-one aides.

## B. Individualized Education Plan

After further evaluation, C.T. was deemed eligible for special education. In December 2023, three weeks after placing him in the EBD classroom, the school district proposed C.T.'s first IEP. The plan set out several functional and behavioral

goals. But the IEP team determined that C.T. would not benefit from a one-on-one aide, explaining that such dedicated support would not allow C.T. to learn to ask for help. And rather than C.T. continuing in the EBD classroom, the IEP recommended placing him at High Road School of Peoria.

High Road is a private therapeutic day school that offers a high teacher-to-student ratio and a small classroom environment. It enrolls exclusively disabled students with no mainstreaming opportunities. The school provides embedded social-emotional learning, a dedicated behavior interventionist, and a weekly on-site board-certified behavior analyst. High Road is also in a different school district and would require C.T. to take a 45-minute bus ride each way without dedicated adult supervision.

### C. Administrative Hearing

When the school district denied requests to revise the IEP, C.T.'s parents asked for a due process hearing before an independent hearing officer. 20 U.S.C. § 1415. In their view, and relevant here, High Road was not the least restrictive environment for C.T.'s education.

The hearing officer conducted a three-day hearing in March and April 2024. She heard the school district's witnesses opine that a one-on-one aide was not needed. None of C.T.'s classmates received such assistance, and C.T received continual individualized attention. Further, the hearing officer heard testimony that C.T. requires a therapeutic day school to meet his behavioral and educational needs. On this point, she found the school district's testimony "overwhelming, credible, persuasive, and uncontroverted by Parents at the hearing."

After reviewing the full administrative record, the hearing officer found the following:

- C.T. had made no progress;

- the EBD program could not meet his behavioral and academic needs;

- additional supports and services, including a one-on-one aide, were unnecessary; and

- C.T. ultimately required a therapeutic day school.

The hearing officer thus concluded that C.T. could not receive a "satisfactory education" in Silas Willard's EBD classroom, and that High Road's therapeutic day school was the least restrictive environment.

**D. Judicial Review**

C.T.'s parents sought judicial review in federal district court. 20 U.S.C. § 1415(i)(2)(A). The complaint automatically triggered a statutory "stay put" injunction, which has kept C.T. at Silas Willard throughout this dispute. 20 U.S.C. § 1415(j).

In October 2024, the district court held a bench trial to supplement the administrative record with additional evidence. Seven witnesses testified. New testimony, not heard by the hearing officer, focused on developments related to C.T.'s behavioral and educational setting since the administrative hearing. C.T.'s parents testified concerning his friendships and his increasingly positive relationship with his teacher. C.T.'s teacher shared that his behavior had shown some improvement. And although she struggled to gain C.T.'s trust and observed some worsening in his behavior after summer break, she testified his "physical aggression is not

fundamentally different from his peers." Further, she partly blamed his IEP for any deterioration because it was not tailored to help him succeed in Silas Willard's EBD classroom during the "stay put" period.

Testimony also provided context and corrected information on the benefits of a one-on-one aide. The district court heard from expert witnesses who had not testified at the administrative hearing. For one, C.T.'s new occupational therapist, after observing him in the EBD classroom, reported that staff were often distracted by other students' needs and spent more time documenting his behaviors than they did assisting him. Because of this, C.T.'s occupational therapist opined that C.T. was not receiving the individualized help he needed. For another, C.T.'s private counselor testified that a one-on-one aide could effectively implement recommended interventions, helping C.T. to stay on task and regulate his emotions before they escalate to a behavioral incident. In contradiction to evidence before the hearing officer, the district court learned that other students at Silas Willard had been provided one-on-one aides.

In December 2024, the district court reversed the hearing officer's decision. After a review of the full record—consisting of the administrative hearing record, the hearing officer's opinion, and evidence adduced at the bench trial—the court found it "more likely than not … that C.T. can receive a satisfactory education in [Silas Willard's] EBD classroom with additional interventions." In support of its ruling, the court found that since the administrative hearing, C.T. had made "significant progress," developed positive relationships, and would benefit from a one-on-one aide in the EBD classroom. So, to the court, the school district's placement at High Road's

therapeutic day school violated the IDEA's LRE provision. The court thus ordered the school district to "create an appropriate" IEP to educate C.T. in Silas Willard's EBD classroom. The school district appeals.

### III. Discussion

Our analysis proceeds in three parts. First, we discuss the standard of review that courts of appeals apply when evaluating claims under the IDEA. Second, based on that discussion, the issues of law raised in this case are evaluated. Third, finding no mistakes of law, we move to the district court's ultimate decision that the school district violated the Act's least restrictive environment provision. Mindful of the deference owed to the professional educators who crafted C.T.'s individualized education plan, we conclude that the district court committed no clear error.

### A. Standard of Review

In the briefs and at oral argument, there was some confusion about the applicable standard of review. This is understandable. The classic articulation, repeated often but rarely explained, is not a picture of clarity: "Although we review the school [district]'s ultimate decision *de novo* because it is a mixed question of law and fact, we will reverse only if the district court's findings were clearly erroneous, absent a mistake of law." *Beth B.*, 282 F.3d at 496 (citing *Bd. of Educ. of LaGrange Sch. Dist. No. 105 v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999)). An apparent tension exists in this formulation between reviewing de novo and reversing only for clear error.

Adding to the confusion, more recent cases simplify the standard of review without quoting the older language. *See, e.g., Alex R.*, 375 F.3d at 612 ("On appeal, our review of

questions of law is plenary and our review of the district court's findings of fact is for clear error.") (citing *Beth B.*, 282 F.3d at 496); *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007) ("[W]e should review the … district court's findings of fact deferentially. We will reverse only if those findings are clearly erroneous … . We review questions of law, as usual, *de novo*."). For all that, this updated language leaves unclear whether the ultimate decision—law applied to fact—is a question of law or a finding of fact.

This court's caselaw harmonizes the apparent tension in two ways. First, only pure questions of law are reviewed de novo. An example is whether a district court applied the wrong standard. *See, e.g.*, *Beth B.*, 282 F.3d at 497 (reviewing "as a matter of law" whether the wrong substantive standard for evaluating the LRE was applied); *Alex R.*, 375 F.3d at 612–13 (reviewing as an issue of law "whether the district court applied the correct legal standard in determining whether Alex received an adequate IEP" (citation modified)). Second, the district court's underlying factual findings and ultimate decision concerning statutory compliance—law applied to fact—are reviewed for clear error. *See id.* at 612, 615–16, 618 (treating the district court's decision on whether an IEP complied with the FAPE and LRE provisions as a finding of fact reviewed for clear error); *Ross*, 486 F.3d at 270, 276–78 (same).

This aligns with how mixed questions of law and fact are generally reviewed. *See, e.g., United States v. Vivirito*, 65 F.4th 341, 343 (7th Cir. 2023) ("A district judge's handling of a mixed question usually is reviewed deferentially, even when that decision resolves the ultimate issue in a case."). Yet "[m]ixed questions are not all alike." *See U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 395–96 (2018). Which standard

to apply in reviewing a mixed question depends on "whether answering it entails primarily legal or factual work." *Id*. at 396. When answering a mixed question requires courts to "expound on the law" and develop "auxiliary legal principles of use in other cases," review should be de novo. *Id*. But for other mixed questions that "immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence [and] make credibility judgments," the district court's decision is reviewed with "deference." *Id.*

The mixed question here is case-specific and primarily entails factual work. True, when courts do not receive additional evidence in IDEA cases, the district court and the appellate court review the administrative record, findings, and decision from the same evidentiary vantage point. But when additional evidence is considered by the district court, as here, that court exercises discretion in admitting that evidence, assesses the credibility and persuasiveness of witnesses in person, weighs the evidence on the full record, and bases its decision on the preponderance of the evidence. *See Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996). In this way, the district court resolves factual disputes and is closer to the evidence than the appellate court. For such fact-intensive determinations, de novo review would be inappropriate. *See Vill. at Lakeridge*, 583 U.S. at 395–96. So, especially when the district court hears additional evidence, we show deference to its decision and reverse only for clear error.

We proceed next to pure issues of law, which as just discussed are reviewed de novo.

**B. Issues of Law**

The school district argues that the district court made three mistakes of law. One concerns deference owed to the administrative decision. A second is about how evidence is weighed. As for the third, the school district characterizes the district court's ultimate decision as an issue of law: "[T]he District Court erred as a matter of law when applying the IDEA's LRE mandate to the facts of this case." But because we review that decision for clear error, we discuss it in a separate section. *See infra* III.C.

*1. Due weight*

The school district submits that the district court failed to give "due weight" to the hearing officer's findings and decision. On legal issues, hearing officers receive no deference. *Alex R.*, 375 F.3d at 611. On issues of fact, the district court independently evaluates the witnesses and evidence, and it must accord "due weight" to the hearing officer's findings and decision. *See id.* at 612 (citing *Rowley*, 458 U.S. at 206); *see also Beth B.*, 282 F.3d at 497. This "due weight" requirement arrives as a gloss on the statutory text, which the Supreme Court inferred from Congress's choice to have courts "receive the records of [state] administrative proceedings." *Alex R.*, 375 F.3d at 612 (citing *Rowley*, 458 U.S. at 206).

The meaning of due weight "varies from case to case." *Id.* When a district court receives no new evidence and relies solely on the administrative record, "due weight" means "clear error" or "substantial evidence." *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 674–75 (7th Cir. 2002) (treating "clear error" and "substantial evidence" as functionally the same, given the judicial mind's inability to make such fine

distinctions, and collecting cases); *Alex R.*, 375 F.3d at 612 ("This level of review is akin to the standards of clear error or substantial evidence.").

But when the district court receives additional evidence, due weight is evaluated on a "sliding scale." *Z.S.*, 295 F.3d at 675. The "more that the district court relies on new evidence … the less it should defer to the administrative decision: '[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have.'" *Alex R.*, 375 F.3d at 612 (quoting *Z.S.*, 295 F.3d at 675). At the "opposite extreme" from cases with no new evidence, "the administrative decision is relatively less important and the district court effectively acts as the factfinder." *Id.*

In evaluating legal issues on a sliding scale, case analogies and distinctions become particularly instructive. Take *Alex R.* There, as here, both parties "adduced new evidence." 375 F.3d at 613. The parents submitted a newspaper article and "extensive affidavits" from various witnesses. *Id.* The school district presented several IEPs and "supporting documents," along with an affidavit from a building administrator. *Id.* at 613–14. This court thus concluded "(1) that this case is close to the end of the spectrum at which the hearing officer was entitled to much less deference and (2) that the district court did not err by giving the hearing officer's findings and decision insufficient weight." *Id.* at 614.

In reaching that result, this court reasoned that the "new evidence" was "a significant part of the total record before the district court" in sheer "amount." It was also "very important" to the court's decision. *Id.* Moreover, this court emphasized that the district court had "specifically noted that it

reviewed both the administrative record and the evidence put forth for the first time before [it]." *Id.*

This case is like *Alex R*. The district court here received a significant amount of material evidence that the hearing officer had not considered. It conducted a bench trial with seven witnesses and more exhibits. The new testimony included post-hearing developments that, to the district court, "impacted both C.T.'s behavior and educational setting." New experts also opined on C.T.'s experience in the EBD classroom and his need for the individualized support of a one-on-one aide. As in *Alex. R*., the new evidence in this case was "a significant part of the total record before the district court." *Id*.

Further, the new evidence was "very important" to the district court's findings and decision. *Id*. Several pages of its opinion were dedicated to this testimony. In evaluating its significance, the court found "[C.T.'s] parents, along with the private professionals involved in his care, credibly and persuasively advocate[d] for a one-on-one aide." Moreover, in the court's view, the school district's witnesses did not "contest these opinions *per se*," but merely repeated their testimony from the administrative hearing that C.T. had enough attention and would not benefit from a one-on-one aide. The court found this "[in]sufficiently address[ed] the need for this level of individualized support."

Moreover, as in *Alex R*., the district court said it reviewed both the administrative record and the new evidence before reaching a decision based on the preponderance of the evidence. *See id.* The court articulated the correct standard of review, expressly acknowledging the "due weight" owed to the hearing officer's findings and decision. And in the end, the court's decision that C.T. could receive a satisfactory

education in the EBD classroom with additional reasonable measures, including a one-on-one aide, relied heavily on post-hearing developments and new expert testimony not reviewed by the hearing officer. So, the reasoning from *Alex R.* controls. The hearing officer's findings and decision in this case are entitled to less deference, and the district court did not err by giving them the weight it did.

The school district disagrees, likening this case to *Z.S.* There, this court concluded that additional evidence received by the district court was "[im]material" and "seems not to have played a significant role in the district court's decision." *Z.S.*, 295 F.3d at 675–76. That case was thus "near the bottom of this sliding scale" and "essentially a no-new-evidence case," so it was subject to clear error or substantial evidence review. *Id*. Yet the district court's opinion in *Z.S.* "contain[ed] language" suggesting it did the "forbidden and, despite not having taken material new evidence, made an 'independent' determination that the school district had not violated the IDEA." *Id*. at 676. In *Z.S.* the district court thus applied "the wrong standard of review" as a matter of law. *Id*.

*Z.S.* is inapposite. Here, the additional evidence was material, significant in amount, and important to the district court's reasoning and conclusion. For similar reasons, *Ross* is also distinguishable. There, the district court heard "some additional testimony," *Ross*, 486 F.3d at 273, but it was an insignificant part of the record relative to the vast administrative proceedings. The hearing officer in *Ross* had "heard testimony for 42 days," making it the "longest special education due process hearing in Illinois history." *Id*. Moreover, the new evidence was not important to the district court's decision, which "rel[ied] heavily on the hearing officer's decision." *Id*.

at 277. Like *Z.S.*, *Ross* was functionally a no-new-evidence case, meaning the standard of review was for clear error or substantial evidence. *Id*. Not so here. For these reasons, the district court did not err as a matter of law by failing to accord significant weight to the results of the administrative proceedings.

### 2. Trial de novo

The school district next asserts that, by placing too much weight on new evidence from the bench trial, the district court conducted an impermissible trial de novo. For support, the school district cites to language in *Monticello*. There, after acknowledging the district court's discretion to allow additional evidence under § 1415(i)(2)(C), this court cautioned that judges "must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*." *Monticello*, 102 F.3d at 901 (quotation omitted). But this language from *Monticello* and subsequent cases concerns whether the district court abused its discretion by *admitting* too much additional evidence, not by *weighing* it improperly once admitted. *Id.* at 901–02; *see, e.g.*, *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 469–70 (7th Cir. 2000). In this way, the school district overreads *Monticello*. Yet there is no need to do so; parties can challenge how evidence is weighed by asserting a court's failure to accord "due weight" or by showing clear error. So, the school district's trial de novo argument must be rejected.[2]

---

[2] As for challenging discretionary decisions about admitting evidence, at the bench trial the school district objected to only one expert witness's testimony. In its briefing, the school district recounts this objection without developing an argument for abuse of discretion. That challenge is thus

*      *      *

Because the district court committed no mistakes of law, we proceed to its ultimate determination—that the school district's placement of C.T. at High Road's therapeutic day school violated his right to be educated in the least restrictive environment. That decision can be reversed only if clearly erroneous, though we remain mindful of the deference owed to professional educators.

### C. Least Restrictive Environment

Recall that in enacting the LRE provision of the Act, Congress expressed a strong preference for mainstreaming. Students with disabilities cannot be removed from the "regular education environment" and placed into "special classes," "separate schooling," or other options, unless "the nature or severity of the disability … is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). And when a student is placed elsewhere on the "continuum of alternative placements," 34 CFR § 300.115, states must select the placement that mainstreams the child to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A).

The implementing regulations add relevant guidance, too. When "selecting the LRE," school districts must consider "any potential harmful effect on the child or on the quality of services" needed. 34 CFR § 300.116(d). The placement must be "as close as possible" to the child's "home." 34 CFR § 300.116(b)(3). It must be "in the school that he would attend

---

waived. *See Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

if nondisabled," unless the child's IEP requires otherwise. 34 CFR § 300.116(c). And states must provide a disabled child reverse mainstreaming opportunities—that is, nonacademic and extracurricular activities alongside non-disabled peers—to the "maximum extent appropriate to the needs of that child." 34 CFR § 300.117; *see also* § 300.107.

But the preference for mainstreaming students with disabilities is not absolute. The Supreme Court has yet to interpret the LRE provision, but it has noted that the Act's use of "appropriate" in 20 U.S.C. § 1412(a)(5)(A) "seems to reflect Congress' recognition that some settings simply are not suitable environments for the participation of some handicapped children." *Rowley*, 458 U.S. at 197 n.21.

### 1. Framework for evaluating the LRE

Without much guidance, nearly every circuit has adopted a multi-factor test.[3] This court has consistently avoided doing

---

[3] The Fourth, Sixth, and Eighth Circuits employ a feasibility test, asking whether the services that make the segregated placement superior could be feasibly provided in the non-segregated setting. If so, the benefits of both settings, the child's disruptive effect, and the costs of mainstreaming are weighed. *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983); *A.W. v. Nw. R-1 Sch. Dist.*, 813 F.2d 158 (8th Cir. 1987); *DeVries v. Fairfax Cty. Sch. Bd.*, 882 F.2d 876 (4th Cir. 1989). The Fifth Circuit, viewing the feasibility test as too intrusive on educational-policy choices, adopted a two-step test: courts ask (1) whether the education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily for the child; and, if not, (2) whether the school's new placement mainstreams the child to the maximum extent appropriate. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). Each step involves a factor-based, "individualized, fact-specific inquiry" into each child and the school's response. *Id.*; *see also Greer v. Rome City Sch. Dist.*, 950 F.2d 688 (11th Cir. 1991); *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204 (3d Cir. 1993); *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966 (10th Cir.

so. *See Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 294–96 (7th Cir. 1988); *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994); *Monticello*, 102 F.3d at 906; *LaGrange*, 184 F.3d at 916–17. As explained in *Beth B.*, "the Act itself provides enough of a framework for our discussion." 282 F.3d at 499.

That "framework" has two steps: At step one, the question is whether the child received a satisfactory education in the regular classroom, or could receive one with additional reasonable measures. If the answer is yes, then removal from the regular classroom violates the Act. If the answer is no, the inquiry at step two is whether the new placement mainstreams the child to the maximum extent appropriate. *Id.*; *Ross*, 486 F.3d at 277.

In *Beth B.*, this court said step one "demands a hard look and a careful analysis of the education" the student was receiving in the regular education classroom. 282 F.3d at 498. Without listing specific factors, the court's "hard look" focused largely on Beth's virtually nonexistent "academic progress" and minimal "developmental progress." *Id.* at 499. A "modicum of developmental achievement," the court held, "does not constitute a satisfactory education." *Id.* At step two, this court concluded that "so long as [the special education classroom] includes reverse mainstreaming opportunities" it is at an "acceptable point along the 'continuum of services' between total integration and complete segregation" and

---

2004); *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111 (2d Cir. 2008). The Ninth Circuit chose a pure balancing approach that draws on factors from both tests. *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403–04 (9th Cir. 1994).

mainstreams Beth to the maximum extent appropriate. *Id*. (citations omitted).

In *Ross*, this court affirmed the district court's determination that the child was not receiving a satisfactory education in the regular classroom. 486 F.3d at 270, 276–78. There, the district court had found that the child was "not making meaningful progress," possessed "minimal" ability to interact with peers, spent little time in class, and displayed aggressive and violent behaviors that were "disruptive" to others in the regular classroom. *Id*. at 277–78. On appeal, this court emphasized the deference owed to the district court's "findings of fact" and "conclusion," making it "easy" to affirm. *Id*. at 270, 277–78. At step two, the court concluded that the new placement mainstreamed the child appropriately under the Act. *Id*. at 277–78 ("[T]he recommended placement school[] present[s] 'reverse mainstreaming opportunities,' which allow for integration into the regular education environment and periodic interaction with nondisabled students.")

The concern about "meaningful progress" has aged well. More recently, the Supreme Court held that an IEP makes available an "appropriate" education—for purposes of the Act's free appropriate public education requirement (FAPE)—as long as it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). The inquiry of *Endrew F.* differs from the inquiry into the LRE, but it is instructive. If the education a child receives in the regular education environment, or could receive with additional reasonable measures, does not result in "progress appropriate in light of the child's circumstances," it is not satisfactory, so removal

would not violate the Act.[4] Beyond the concern for progress, our circuit has resisted supplying a definition of "satisfactory education" or a list of factors for evaluating it. And although comparisons to *Beth B.* and *Ross* are helpful, each child is different and requires an individualized, fact-specific inquiry when evaluating the LRE.

### 2. Satisfactory education

At every stage, the parties, hearing officer, and district court assumed the LRE analysis in this case begins at step one. That is not exactly correct. Step one asks whether the child can be removed from the *regular* classroom and placed into some form of segregated *special* education. 20 U.S.C. § 1412(a)(5)(A). But by mutual agreement between his parents and the school district, C.T. has already been removed from general education and placed in the segregated EBD classroom. His parents

---

[4] With FAPE claims, courts review only whether the "prospective judgment by school officials" expressed in an IEP was "reasonably calculated" to enable progress for the individual child. There is no "guarantee" of "any particular [educational] outcome." *Endrew F.*, 580 U.S. at 398. In that context, only the prospective judgment is reviewed for compliance with the Act. And it is not limited to the regular classroom but applies to any placement.

By contrast, the hard look at whether a child receives a "satisfactory education" for LRE purposes focuses on the regular classroom. It is also retrospective and, in some cases, prospective. It looks back at the education the child has been receiving in the regular classroom under his IEP (retrospective), but if not satisfactory, it also assesses whether it could be made satisfactory with additional reasonable measures (prospective). And unlike the FAPE inquiry, if the LRE analysis at step one shows an education is not and could not be achieved satisfactorily, that does not violate the Act. Just the opposite. It means the removal was not a violation, and the analysis proceeds to step two of the framework in *Beth B.* and *Ross*.

hope to keep him there. But where to place C.T. on the "continuum" of alternative placements is a step two question. So, if High Road mainstreams C.T. to the maximum extent appropriate, the IDEA does not prevent this new placement.

As far as placements go, High Road is as restrictive as a placement can be. Per C.T.'s IEP, that school enrolls exclusively students with disabilities and has no mainstreaming or reverse mainstreaming opportunities. It is not the school C.T. would attend if not disabled, and it is much farther from C.T.'s home. The only potential harm considered in the IEP was the lack of mainstreaming, but the district court heard testimony of various ways the placement could negatively impact C.T.'s development. By contrast, the EBD classroom mainstreams C.T. to a greater extent and is less restrictive. So, the Act requires that C.T. remain in the EBD classroom as long as it would be "appropriate."

In this case, in which one placement on the continuum of alternative placements is in a different school district and is significantly more restrictive than another, steps one and two dovetail. *See, e.g.*, *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 272 (3d Cir. 2003) ("[T]he LRE would ideally be the same school the child would have attended if [he] were not disabled … [but] such placement is only appropriate to the extent that it 'satisfactorily educates' the disabled child."). Inquiring into the appropriateness of the EBD classroom requires a fact-intensive, careful examination of the education C.T. has received or could receive there with additional reasonable measures. So, in this case, we treat this inquiry like the "hard look" at step one.

In the school district's view, an EBD classroom cannot provide C.T. with a "satisfactory education." Yet after conducting

a bench trial and reviewing the full record, the district court determined otherwise, finding it "more likely than not … that C.T. can receive a satisfactory education in [Silas Willard's] EBD classroom with additional interventions."

For support, the district court found that, in the time between the administrative hearing and the bench trial, C.T. made "significant progress" and formed "positive relationships" in the EBD classroom. The court observed that by March 2024, C.T. had reached a behavioral goal in his IEP that he was not expected to reach until December 2024. Moreover, C.T.'s math and reading standardized test scores improved dramatically. Tweaks in C.T.'s medication regimen, the court noted, had resulted in positive outcomes, and his private counselor testified to improving emotional regulation. As to positive relationships, C.T.'s mother testified to his friendships in the EBD classroom and shared that C.T. perceives his teacher as supportive and as the only one who has not given up on him yet. C.T.'s new occupational therapist, who made a short observational visit to the EBD classroom, reported that C.T. joked around playfully with his classmates.

The district court also found that C.T. would benefit from a one-on-one aide. C.T.'s new occupational therapist further testified that staff were often distracted by other students' needs and spent more time documenting C.T.'s behaviors than assisting him. A private counselor testified that a one-on-one aide could effectively implement recommended interventions, which could help C.T. stay on task and regulate his emotions. The court also learned, contrary to what was told to the hearing officer, that other students at Silas Willard received one-on-one aides. And in evaluating this testimony, the court found "[C.T.'s] parents, along with the private

professionals involved in his care, credibly and persuasively advocate[d] for a one-on-one aide."

Finally, the district court was sensitive to the timing of C.T.'s change in placement. The school district recommended a new placement only three weeks after C.T. joined the EBD classroom, before he had a chance to receive an education under an IEP tailored to enable progress in light of his individual circumstances. The school district warns that considering this factor will have unintended consequences and negative precedential effects. Schools, they argue, will not be able to appropriately place students in more restrictive learning environments unless, and until, they exhaust every possible measure. But each case, like each student, is different. In evaluating whether a student could receive a satisfactory education, a district court can at least consider the absence of meaningful evaluation of a student's performance under an adequate IEP.

In the school district's view, the district court ignored evidence and relevant considerations. It points to the "full scope" of C.T.'s behavioral issues and their disruptive effect, reductions in C.T.'s academic workload to avoid frustration, his worsening behavior after summer break, and testimony that C.T.'s teacher struggled to build trust with him. Yet, C.T.'s teacher testified that his "physical aggression is not fundamentally different from his peers." Reductions in workload are part and parcel of the EBD classroom accommodation, and it seemed to work because C.T. made improvements. As for deterioration, C.T.'s teacher partly blamed his IEP, which was not designed to help him succeed in the EBD classroom. And the court took that seriously. In short, after our careful review of the record, we find no clear error and thus do not reverse.

### 3. *Deference to Professional Educators*

The school district also argues the district court failed to defer to professional educators who crafted C.T.'s IEP. On this point, the Supreme Court acknowledged—when interpreting the Act's FAPE provision—that judicial review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. This court interpreted that language from *Rowley* to mean that IEPs are reviewed for reasonableness. *Z.S.*, 295 F.3d at 676 (citing *Rowley*, 458 U.S. at 206–07) ("The critical issue … was whether the school administrators were unreasonable."); *Ross*, 486 F.3d at 278 ("[W]e cannot undertake an independent assessment … we can only decide whether the hearing officer … came to a rational conclusion.").

The Supreme Court has since clarified the meaning of this language, again in the FAPE context. Deference to decisions made in an IEP, the Court explained, derives from the "application of expertise and the exercise of judgment by school authorities." *Endrew F.*, 580 U.S. at 404. But given the nature of the IEP process, "respective opinions" will be "fully air[ed]." *Id*. And by the time a "dispute reaches court," school authorities will have had a "complete opportunity to bring their expertise and judgment to bear on areas of disagreement." *Id*. So, reviewing courts may "fairly expect" those authorities to offer a "cogent and responsive explanation for their decisions." *Id.* Though district courts may not substitute their own views, they need not accept rational explanations that lack cogency and responsiveness to other views.

Given this clarification, the district court did not substitute its own views or fail to defer to professional educators on

educational issues. The point of an IEP is to make goals easily measurable. A court is as equipped as professional educators to evaluate fact questions under an IEP, such as progress towards goals, relationship formation, and whether a child gets along with others.

Even when deference was owed, the district court gave it. Assessing the severity of C.T.'s disruptive effect in the EBD classroom, for example, involves some expertise. But on this point, the court heard conflicting testimony from the professional educators. C.T.'s teacher testified that his behavior was no worse than the other students in the EBD classroom. By crediting testimony from one professional educator over another, the district court did not fail to accord deference.

Evaluating additional reasonable measures, like a one-on-one aide, also implicates expertise. Yet, the district court found explanations for why C.T. did not need a one-on-one aide wanting for cogency and responsiveness. After C.T.'s private experts opined on the benefits of a one-on-one aide, the district court found that the school's witnesses repeated their views from the administrative hearing without "contest[ing] [opposing] opinions *per se*." These explanations also differed from the initial reason given by the IEP team. Finally, the school district did not explain why other children at Silas Willard received one-on-one aides or how their individual needs differed from C.T.'s. This made the decision to deny C.T. such dedicated support look arbitrary.

## IV. Conclusion

The district court held that the school district's placement of C.T. at High Road's therapeutic day school violated the IDEA's least restrictive environment requirement. In reaching

this conclusion, the district court made no mistakes of law. Nor did it clearly err in its factual findings or in concluding that C.T. can receive a satisfactory education in Silas Willard's EBD classroom with additional reasonable measures, like a one-on-one aide.

AFFIRMED